STATE OF NORTH CAROLINA v. KEITH BRADLEY EAST

No. 478A95

(Filed 7 March 1997)

**1. Criminal Law § 115 (NCI4th Rev.)— discovery—psychiatric examination of defendant—preparation of written report ˙for State**

The trial court did not err by ordering defendant's psychiatrist, who had delivered an oral report of his examination of defendant to defense counsel, to prepare a written report of his findings for the State pursuant to N.C.G.S. § 15A-905(b). There is nothing in the statute that limits the trial court to production of existing written reports, and it would be unacceptable to allow the defense to keep secret critical evidence solely because that evidence was never placed in written form.

**Am Jur 2d, Depositions and Discovery §§ 464-466.**

**2. Evidence and Witnesses § 2675 (NCI4th)— psychiatric examination of defendant—evaluation for trial—not privileged**

A psychiatrist's report of the results of his examination of defendant was not protected by the psychologist-client privilege of N.C.G.S. § 8-53.3 where the psychiatrist was appointed by the trial court at the request of defense counsel to evaluate defendant's mental status rather than to treat defendant. Moreover, even if the examination results were privileged, the trial court could properly compel their disclosure on the ground that it was necessary to the administration of justice.

**Am Jur 2d, Witnesses § 451.**

**Validity and construction of statutes providing for psychiatric evaluation of accused to determine mental condition. 32 ALR2d 434.**

STATE v. EAST

[345 N.C. 535 (1997)]

Privilege, in judicial or quasi-judicial proceedings, arising from relationship between psychiatrist or psychologist and patient. 44 ALR3d 24.

**3. Jury § 153 (NCI4th)— capital trial—jury selection—imposition of death penalty—question not improper**

The prosecutor's question to each prospective juror in a capital trial, "And after having made that decision, if the people of the State of North Carolina prove to you beyond a reasonable doubt that the death penalty was the appropriate punishment you would vote to impose it?" was not a misstatement of the law and did not violate defendant's due process rights. Any prejudice to defendant from this single question was ameliorated by the trial court's instructions prior to the *voir dire* and prior to the sentencing determination.

**Am Jur 2d, Jury §§ 205, 208, 210.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**4. Jury § 226 (NCI4th)— capital trial—excusal of veniremen for cause—no blanket denial of rehabilitation**

The trial court's excusal for cause of eleven prospective jurors without allowing defendant the opportunity to rehabilitate those jurors did not constitute an improper "blanket ruling" against rehabilitation where the trial court personally questioned the eleven jurors at issue, and there is no evidence in the record that the trial court automatically rejected defendant's requests to rehabilitate those jurors. The fact that the trial court disallows all of defendant's requests for rehabilitation does not, in the absence of other evidence, amount to a *de facto*, blanket ruling against all rehabilitation.

**Am Jur 2d, Jury §§ 185, 228.**

**5. Evidence and Witnesses § 1694 (NCI4th)— photographs of murder victims—crime scene and autopsy—not excessive**

The trial court did not abuse its discretion in the admission of color photographs of the bodies of two murder victims at the crime scene and during the autopsy where each photograph was different from the others and was used to illustrate an S.B.I. agent's testimony about the crime scene or the medical exam-

iner's testimony or to support the medical examiner's opinions about the wounds and the causes of the deaths.

**Am Jur 2d, Homicide §§ 417, 418.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

6. **Evidence and Witnesses § 876 (NCI4th)— statement by murder victim—hearsay—state of mind exception**

A murder victim's statement to a neighbor several hours before the murder that she had to return to her home because she saw defendant coming and her pocketbook was in the house was admissible under the state of mind exception to the hearsay rule where the victim's state of mind regarding her intention not to give defendant the money he wanted was relevant to the issue of defendant's motive for the murder. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence § 667.**

7. **Evidence and Witnesses § 2261 (NCI4th)— S.B.I. agent— expert testimony—victim standing and door closed**

The trial court did not abuse its discretion in permitting an S.B.I. agent to give expert opinion testimony in a prosecution for two murders that the male victim was standing when first hit with a blunt-force instrument and that the door to the house was closed at the time he was accosted, although the S.B.I. agent was not an expert in blood-spatter evidence, where the witness had extensive training and experience in forensic crime-scene collection and processing; she had a bachelor's degree in criminology and a master's degree in criminal justice; she had testified as a crime-scene specialist in over seventy-five cases; and her opinions were not based solely on blood-spatter evidence but were deduced from a combination of blood spatters, the location of the victim's glasses, the relationship between the body and the door, and the location of wounds on the victim's head. N.C.G.S. § 8C-1, Rule 702.

**Am Jur 2d, Expert and Opinion Evidence §§ 55-59.**

**Admissibility, in criminal Prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

**8. Criminal Law § 103 (NCI4th Rev.)— discovery—statements by defendant—substance of planned testimony revealed— testimony admissible**

Where the prosecutor informed defense counsel pursuant to a discovery request that a witness planned to testify that defendant had called a murder victim a "bitch" and had stated that he "hated" the victim, the trial court did not err by permitting the witness to testify that defendant also stated that he wished the victim was dead since the essence of the witness's testimony was that defendant had a hatred for the victim, and the substance of the planned testimony of the witness was conveyed to defense counsel as required by N.C.G.S. § 15A-903(a)(2). Moreover, the trial court did not abuse its discretion in failing to exclude the evidence as a sanction for any failure by the State to comply with discovery.

**Am Jur 2d, Depositions and Discovery §§ 428, 430, 431.**

**Right of accused in state courts to inspection or disclosure of evidence in possession of prosecution. 7 ALR3d 8.**

**What is accused's "statement" subject to state court criminal discovery. 57 ALR4th 827.**

**9. Homicide § 706 (NCI4th)— failure to instruct on voluntary manslaughter—error cured by verdict**

The trial court's failure to instruct on voluntary manslaughter was harmless error where the court properly instructed the jury on first-degree and second-degree murder and the jury returned a verdict of guilty of first-degree murder.

**Am Jur 2d, Homicide § 530.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of higher or lesser offense. 15 ALR4th 118.**

**10. Criminal Law § 1359 (NCI4th Rev.)— capital sentencing— pecuniary gain and robbery aggravating circumstances— same evidence not used**

The record established that robbery and pecuniary gain aggravating circumstances were not supported by precisely the same evidence, and the trial court thus properly submitted both circumstances to the jury in this capital sentencing proceeding

STATE v. EAST

[345 N.C. 535 (1997)]

for two first-degree murders, where the evidence showed that defendant committed the murders in the course of stealing money from the victims and also in the course of stealing the keys to the victims' car; defendant stole the keys in order to use the car as transportation and not to sell the car and convert it into cash; and the theft of money supports the pecuniary gain aggravating circumstance and the theft of the keys supports the robbery aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598-600.**

**11. Criminal Law § 451 (NCI4th Rev.)— argument of counsel— no injection of personal opinions**

The prosecutor did not inject impermissible personal opinions in his argument to the jury in a capital sentencing proceeding by his argument questioning the truth of defendant's claim that the male victim had threatened him with a knife and by his argument that "[w]e would never ask you to convict if we did not believe it was the truth."

**Am Jur 2d, Trial § 572.**

**Propriety and prejudicial effect of prosecutor's argument to jury indicating his belief or knowledge as to guilt of accused—modern state cases. 88 ALR3d 449.**

**12. Criminal Law § 1371 (NCI4th Rev.)— capital sentencing— heinous, atrocious, or cruel aggravating circumstance— sufficiency of evidence**

The trial court properly submitted the especially heinous, atrocious, or cruel aggravating circumstance to the jury in a capital sentencing proceeding for two first-degree murders where the evidence showed that the victims, two diminutive, peaceful persons in their seventies, were beaten to death in their own home by their 260-pound nephew with a blunt-force object; they experienced extreme pain and suffering; each suffered several defensive wounds; the male victim was struck at least fourteen times, the female victim was struck at least ten or eleven times, and many of the blows came after the victims fell to the floor; and the victims were beaten so severely that their bones were crushed, their skulls were fractured exposing brain tissue, and a finger of the female victim was amputated.

**Am Jur 2d, Criminal Law §§ 598, 599.**

STATE v. EAST

[345 N.C. 535 (1997)]

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

13. **Criminal Law § 1384 (NCI4th Rev.)— mitigating circumstance—mental or emotional disturbance—peremptory instruction—failure of jury to find—no constitutional violation**

Failure of the jury in a capital sentencing proceeding to find the mental or emotional disturbance mitigating circumstance when the trial court had given a peremptory instruction on this mitigating circumstance did not violate defendant's rights to due process and a fair trial. Even when all of the evidence supports a finding that a mitigating circumstance exists and a peremptory instruction is given, the jury could properly fail to find the mitigating circumstance if it does not believe the evidence.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 741.**

14. **Criminal Law § 1402 (NCI4th Rev.)— death sentences not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate where the jury convicted defendant under the theory of malice, premeditation, and deliberation; the murders were found by the jury to be especially heinous, atrocious, or cruel; the jury found three additional aggravating circumstances; the victims, two elderly persons, were beaten to death by a thirty-four-year-old family member in their own home in the course of a robbery; the victims suffered numerous defensive wounds and likely experienced great pain before death; defendant did not seek medical help for the victims but fled the state in an attempt to elude law enforcement; and defendant showed no remorse for the victims.

**Am Jur 2d, Criminal Law §§ 628, 629.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by McHugh, J., at the 27 October 1995 Criminal Session of Superior Court, Surry County, upon two jury verdicts finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed by this Court 19 March 1996. Heard in the Supreme Court 17 October 1996.

*Michael F. Easley, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*Urs R. Gsteiger and Elizabeth Horton for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 15 August 1994 for the first-degree murders of Harold Delaney and Geraldine East Delaney. On 17 January 1995, the defendant also was charged in one three-count indictment with first-degree burglary, larceny and possession; in a second three-count indictment with larceny, receiving and possession; and in a third indictment with robbery with a dangerous weapon. The defendant was tried capitally, and the jury found the defendant guilty of the first-degree murders of both Harold Delaney and Geraldine East Delaney on the basis of malice, premeditation and deliberation. The defendant also was convicted of first-degree burglary, felonious larceny and robbery with a dangerous weapon. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death for each of the murders. Judge McHugh sentenced defendant to life imprisonment for first-degree burglary, forty years for robbery with a dangerous weapon and arrested judgment for the felonious larceny conviction. Judge McHugh then sentenced the defendant to death for each of the murder convictions. For the reasons stated herein, we conclude that the defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

At trial, the State presented evidence tending to show that on 2 August 1994, the victims, Dr. Harold Delaney and his wife, Mrs. Geraldine East Delaney, were visiting Pilot Mountain, North Carolina, from their home in Maryland. Dr. Delaney was seventy-five years old and was in semiretirement after a distinguished chemistry career in which he had worked on the Manhattan Project and had served in numerous prominent academic positions and presidential appointments. Mrs. Delaney was seventy-one years old and a retired teacher. The Delaneys were the defendant's aunt and uncle. They were staying in the home of Mrs. Delaney's mother, Mrs. Sophia East, who is also the grandmother of the defendant. The Delaneys bought the house for Mrs. East before she was forced to go to a nursing home. The Delaneys stayed at the house whenever they visited Mrs. East and the rest of their family, many of whom lived in close proximity to the house.

STATE v. EAST

[345 N.C. 535 (1997)]

On the afternoon of 2 August 1994, at approximately 5:00 p.m., Mrs. Delaney was visiting Ms. Ada Lovell while Dr. Delaney napped. Ms. Lovell lives across the street from the house in which the Delaneys were staying, which Ms. Lovell described as being within "spitting distance." The two women were talking when Ms. Lovell's grandson announced that the defendant had pulled up in the driveway of the Delaneys' house. Mrs. Delaney suddenly proclaimed, "Oh, I've got to go. Harold is asleep, and my pocketbook is up there." Mrs. Delaney quickly departed. She intercepted the defendant before he could go in the house, and the two engaged in some sort of conversation in front of the house. This was the last time Ms. Lovell saw Geraldine Delaney alive.

The State presented further evidence tending to show that during the evening of 2 August 1994, the defendant went to a store and then to the house of an acquaintance at approximately 8:00 p.m. There, defendant drank some wine and listened to the radio. Later, the defendant got a ride home, but he asked the driver to drop him off in front of his grandmother's house—the house where the Delaneys were staying. It was then approximately 10:30 p.m.

On 4 August 1994, the defendant went to the apartment of his former girlfriend, Deborah Hartman, in Winston-Salem. The defendant was in obvious distress. He was crying, was acting agitated and was pacing continuously. Defendant told Ms. Hartman that he had to either leave the country, go to jail or commit suicide. He also said that he was in serious trouble and that he needed $169 for a bus ticket to El Paso, Texas. Upon repeated questioning by Ms. Hartman, the defendant eventually told her that he and his uncle, Dr. Delaney, had gotten into an argument, that Dr. Delaney had threatened him with a knife and that he had "snapped" and lost control because he was high on drugs at the time. Defendant said that he had hit his aunt and uncle with what he thought was a baseball bat and that both were dead. When asked what the argument was about, the defendant stated, "About him being him and me being me." Ms. Hartman was afraid the defendant might just be trying to scam money from her for drugs, so she took defendant to the teller machine and withdrew $60 for him. Ms. Hartman then dropped the defendant off in the parking lot of the apartments and watched him depart. Defendant drove off in a Buick Park Avenue, which Ms. Hartman identified at trial as belonging to the Delaneys.

Ms. Hartman, in distress by this time herself, made a phone call to the Pilot Mountain police and, without giving her name, reported

that something might have happened to the Delaneys. When the offi-
cers arrived, they found the badly beaten body of Dr. Delaney just
inside the door of the house and the similarly beaten body of Mrs.
Delaney lying in the hall. A search of the house revealed Mrs.
Delaney's pocketbook in the kitchen with a wallet lying next to it. No
folding money was found in the wallet or the rest of the house,
despite the fact that the Delaneys had withdrawn several hundred
dollars from their Maryland bank account shortly before their deaths.
Many of the drawers in the cabinets and in the furniture of the house
were ajar. No knives or other weapons besides normal kitchen uten-
sils were found anywhere in the house.

Evidence gathered from the crime scene and from autopsies
conducted on the bodies established that the Delaneys were killed
by multiple blows to the head with a blunt-force instrument. In the
opinions of the experts who testified, both Dr. and Mrs. Delaney
were in standing positions when they were first struck. Blood
spatter patterns established that they were also struck numerous
times after they fell to the floor. Mrs. Delaney suffered ten to eleven
separate wounds. She had lacerations all over her head and face,
bones in her face were broken, and her skull had been fractured with
such force that her brain was exposed. Mrs. Delaney's ribs were also
broken, and there was bleeding in the heart cavity. As many as four
of her wounds were defensive in nature, including one so severe that
it amputated one of the fingers of her right hand. Dr. Delaney was
struck at least fourteen separate times. He also suffered numerous
lacerations and broken bones, including a fractured skull. Although
Dr. Delaney suffered at least four blows to the arms that were indica-
tive of defensive wounds, the majority of Dr. Delaney's wounds were
to the back of the head and the upper back area. This indicated that
Dr. Delaney's assailant had struck him from behind. These injuries
caused the Delaneys significant pain and suffering prior to their
deaths.

The defendant testified at trial and stated that on 2 August 1994,
he bought over $300 worth of crack cocaine, which he used between
2:00 p.m. and that evening. He also drank some wine. Defendant
claimed that all he could remember about the killings was that he
was visiting his uncle, Dr. Delaney, and that he suddenly felt "threat-
ened." As a result, defendant grabbed the handle of some object, and
then everything went blank. Defendant testified that the next thing he
remembered was driving in a car and feeling that he had done some-
thing terrible. The defendant then said he called home. After talking

with his mother, the defendant turned himself in to the police in El Paso, Texas.

The Delaneys' car was found in Beaumont, Texas. An investigation by the North Carolina State Bureau of Investigation revealed the presence of the defendant's fingerprints on the Delaneys' car. Defendant's fingerprints were also on several items in the car, including a page in a road atlas which contained a map of the United States.

The defense claimed the defendant suffered from psychological deficits and substance abuse problems. Defendant's psychiatrist, Dr. John Warren, described the defendant as a crack cocaine abuser who suffered from chronic depression. Dr. Warren also stated that, at the time the Delaneys were killed, defendant was intoxicated with cocaine and was suffering from an unstable personality and neuropsychological deficits. Dr. Warren's opinion was that defendant's mental condition prevented him from forming, or greatly impaired his ability to form, the specific intent to kill.

Several witnesses for the State, including some from defendant's family, testified that they had never known the defendant to act as though he was on drugs or to "lose control." Several witnesses also testified that the defendant did not appear to be intoxicated from drugs or alcohol on the day of the murders, and that he was extremely coherent and polite even up until the time he was dropped off in front of the Delaneys' house. Evidence was presented, however, that the defendant experienced extreme animosity toward the Delaneys. The defendant felt that the Delaneys were pretentious and that they looked down on him for having done nothing with his life. Two witnesses testified that the defendant had wished death on at least Mrs. Delaney during two recent visits. In June of 1994, during the visit just before the fateful August visit, defendant stated about Mrs. Delaney, "That bitch is back. I hate that bitch. I wish she was dead."

## PRETRIAL ISSUES

[1] In his first assignment of error regarding pretrial issues, defendant argues that the 9 October 1995 order directing Dr. Warren to prepare a written report of his findings for the State was improper. Defendant's contentions are twofold: first, that there is no requirement in N.C.G.S. § 15A-905 that a party prepare a report for the op-

position, and second, that Dr. Warren's findings are privileged psychologist-client communications under N.C.G.S. § 8-53. We find defendant's arguments unpersuasive.

N.C.G.S. § 15A-905(b) authorizes the court to order the defendant "to permit the State to inspect . . . results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case . . . which the defendant intends to introduce in evidence at the trial . . . when the results or reports relate to his testimony." N.C.G.S. § 15A-905(b) (1988). Pursuant to the statute, the State moved for the defendant to produce a written report of Dr. Warren's psychological examination. The defendant admitted during the motion hearing that Dr. Warren had delivered an oral report of the examination results to defense counsel. There is nothing in N.C.G.S. § 15A-905(b) that limits the trial court to production of existing written reports. In this case, Dr. Warren possessed the "results" of his examination. The fact that they had not been reduced to a written report is irrelevant, and the trial court acted properly in ordering production of those results in the form of a written report to the State. It would be unacceptable to allow the defense to keep secret critical evidence solely because that evidence was never placed in written form, and N.C.G.S. § 15A-905(b) properly empowers the trial court to prevent such a result.

[2] Regarding defendant's claim of psychologist-client privilege, defendant has failed to meet the standard for protection of the communication in question. Under N.C.G.S. § 8-53.3, the information must have been "acquired in the practice of psychology," and the information must be "necessary to enable him or her to practice psychology." N.C.G.S. § 8-53.3 (Supp. 1996). In *State v. Taylor*, 304 N.C. 249, 271, 283 S.E.2d 761, 776 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983), this Court held that no physician-patient privilege is created between a physician and a criminal defendant who is examined in order to determine whether the defendant is able to stand trial. This is analogous to the situation in this case where the psychologist was appointed by the trial court at the request of defense counsel for the purpose of evaluating the defendant's mental status, as opposed to treating him. Moreover, the trial court is always at liberty to compel disclosure of privileged communications if it "is necessary to a proper administration of justice." N.C.G.S. § 8-53.3. Such is the situation in this case. Had the trial court not forced disclosure of Dr. Warren's examination results, the defense would have gained an unfair advantage by keeping relevant and critical evidence from

the State. Thus, we conclude this assignment of error is without merit.

In his next assignment of error, defendant contends that the trial court allowed the State, on *voir dire*, to make repeated misstatements to the jury about North Carolina's death penalty law in violation of defendant's rights to due process and trial by jury. Defendant argues that because the trial court gave prospective jurors preliminary instructions regarding the capital sentencing procedure on the first day but did not repeat those instructions for individuals called later in the week, the district attorney's questioning amounted to improper misstatements of the capital sentencing procedure. We disagree.

[3] During *voir dire*, each prospective juror was asked the following question by the district attorney: "And after having made that decision, if the people of the State of North Carolina prove to you beyond a reasonable doubt that the death penalty was the appropriate punishment you would vote to impose it?" We do not find the district attorney's question to be a misstatement of the law. In *State v. Williams*, 339 N.C. 1, 22, 452 S.E.2d 245, 258 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995), this Court approved the following question by the State: "So you are telling me that if you were convinced beyond a reasonable doubt that [the death penalty] was the proper punishment, that you . . . could do your duty and do that very thing?" The question in *Williams* is almost identical to the question posed to jurors in the instant case. As a result, we hold the question did not violate defendant's due process rights.

Even assuming that the question was not a perfect recitation of the jurors' obligations under this aspect of the capital sentencing determination, this portion of the State's examination of jurors cannot be analyzed in a vacuum. First, the record shows that the trial court gave substantially the same preliminary instructions to prospective jurors at the opening of court on each of the two days of jury selection. These instructions explained, *inter alia*, the circumstances of the case and the jurors' duties under the capital sentencing proceeding if the case should reach the sentencing phase. Second, the trial court gave extensive, correct instructions to the actual jury on its duties during the jury charge prior to jury deliberations in the capital sentencing phase. Any prejudice that might have accrued in favor of the State from this single question was ameliorated by the trial court's instructions, both prior to *voir dire* and prior to sentenc-

ing determination, with which the defendant finds no fault. This assignment of error is overruled.

**[4]** Next, defendant assigns error to the trial court's excusal for cause of several prospective jurors without allowing the defense the opportunity to rehabilitate these jurors. Defendant contends that this action was improper in that it amounted to a "blanket ruling" against rehabilitation, pursuant to *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993), and was in derogation of his rights to due process and trial by jury. We decline to find such violations.

A defendant has no right to attempt to rehabilitate jurors, and the trial court is not required to allow a defendant to rehabilitate jurors challenged for cause. *State v. Burr*, 341 N.C. 263, 281-82, 461 S.E.2d 602, 611 (1995), *cert. denied,* — U.S. —, 134 L. Ed. 2d 526 (1996). The trial court retains discretion as to the extent and manner of questioning, and its decisions will not be overturned absent a showing of abuse of discretion. *State v. Wilson*, 313 N.C. 516, 526, 330 S.E.2d 450, 458 (1985). There is no evidence in the record that the trial court did not consider each juror separately or that the trial court ruled out the possibility of rehabilitation. As a matter of fact, the trial court personally questioned each of the eleven jurors at issue. The record establishes that all of these jurors expressed an inability to follow the law, although their answers may not have been as unequivocal as other jurors. There is no evidence in the record that the trial court automatically rejected defendant's requests to rehabilitate these jurors. The fact that a trial court happens to disallow all of defense counsel's requests for rehabilitation does not, in the absence of other evidence, amount to a *de facto*, blanket ruling against all rehabilitation attempts. *See Brogden*, 334 N.C. 39, 430 S.E.2d 905 (trial court's misapprehension of law led to expressed and erroneous preclusion of all rehabilitation efforts). This assignment of error is therefore overruled.

## GUILT/INNOCENCE PHASE

**[5]** In his first assignment of error regarding the guilt/innocence phase of his trial, defendant contends that the trial court abused its discretion by admitting several color photographs of the victims' bodies at the crime scene and during the autopsy. Defendant asserts that the pictures were needlessly cumulative and gruesome, resulting in the arousal of the jury's passions against the defendant and thereby violating his rights to due process and trial by jury. We find defendant's argument to be without merit.

The trial court must weigh the probative value of the photographs against the danger of unfair prejudice to the defendant in deciding whether to admit photographic evidence. *State v. Gregory*, 340 N.C. 365, 387, 459 S.E.2d 638, 650 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). The decision regarding the admission of photographs of crime victims lies within the sound discretion of the trial court. *Id.* "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). In this case, all of the photographs were different from one another and were all used appropriately for evidentiary purposes during the trial. Of the exhibits to which defendant assigns error, exhibits 13-16, 18, and 23-28 were all used by State Bureau of Investigation Agent Pamela Tulley to illustrate her testimony about the scene of the crime. The only other exhibits questioned, numbers 50-58, were used by the medical examiner to illustrate his testimony and to support his opinions about the wounds and the causes of death. We therefore find no abuse of discretion in the trial court's admission of these photographs into evidence, and accordingly, this assignment of error is overruled.

[6] Next, defendant assigns as error the admission of testimony from Ms. Ada Lovell that Geraldine Delaney said she had to leave because she saw the defendant coming and her pocketbook was in the house. Defendant argues that this statement was irrelevant hearsay under Rule 803(3) of the North Carolina Rules of Evidence because it was made several hours before the murders, and there was no showing that the statement related to an alleged confrontation before the murders. We disagree.

In this case, the State presented evidence that Geraldine Delaney was murdered between Tuesday, 2 August 1994, and Thursday, 4 August 1994. Ms. Lovell testified that on the afternoon of 2 August 1994 at approximately 5:00 p.m., Mrs. Delaney was visiting Ms. Lovell's house. When Mrs. Delaney was told defendant was approaching, she said to Ms. Lovell, "Oh, I've got to go. Harold is asleep, and my pocketbook is up there," and rushed back to her house. Prior to ruling on the admissibility of this statement, the trial court conducted a *voir dire* at which the proposed testimony was proffered. The trial court ruled the testimony admissible under N.C.G.S. § 8C-1, Rule

803(3) as a statement of the victim's then existing state of mind or emotional condition.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). However, under N.C.G.S. § 8C-1, Rule 803(3), the state of mind exception to the hearsay rule, " '[e]vidence tending to show a presently existing state of mind is admissible if the state of mind sought to be proved is relevant and the prejudicial effect of the evidence does not outweigh its probative value.' " *State v. Miller*, 344 N.C. 658, 675, 477 S.E.2d 915, 925 (1996) (quoting *State v. Locklear*, 320 N.C. 754, 760, 360 S.E.2d 682, 685 (1987)).

When intent is directly in issue, a declarant's statements "relative to his then existing intention are admitted without question." 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 218, at 92 (4th ed. 1993); *see State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197 (pre-Rules case, murder victim's statement that he would testify against defendant properly admitted as evidence of defendant's motive), *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). In the present case, the statements attributed to Mrs. Delaney were relevant to prove two material facts: first, that she feared defendant would steal from her, and second, that she had no intention of giving money to the defendant. Because the victim's state of mind regarding her intention not to give defendant the money he wanted was relevant to the issue of defendant's motive for murder, the testimony in question was admissible under the state of mind exception. The fact that the statement was made some time before the estimated time of the murders is irrelevant. In *State v. Taylor*, 332 N.C. 372, 420 S.E.2d 414 (1992), this Court observed that, "Rule 803(3) does not contain a requirement that the declarant's statement must be closely related in time to the future act intended." 332 N.C. at 386, 420 S.E.2d at 422-23. Accordingly, defendant's assignment of error is overruled.

[7] In his next assignment of error, defendant argues that the trial court's admission of Agent Tulley's opinion testimony regarding the crime scene amounted to an abuse of discretion. Defendant's argument centers on two opinions rendered by Agent Tulley: that Dr. Delaney was standing when first hit and that the door to the house was closed at the time he was accosted. Defendant contends that these opinions were rendered without proper foundation by a witness not qualified as an expert because Agent Tulley was not an expert in

blood-spatter evidence. We find defendant's argument to be without merit.

The admissibility of expert testimony is governed by Rule 702 of the North Carolina Rules of Evidence, which provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1992). The trial court has broad discretion in the determination and admission of expert testimony. In *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995), this Court stated:

"It is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession." *State v. Evangelista*, 319 N.C. 152, 164, 353 S.E.2d 375, 384 (1987). "It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.' " *Id.* at 164, 353 S.E.2d at 384 (quoting *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978)). Further, "the trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony." *Bullard*, 312 N.C. at 140, 322 S.E.2d at 376.

*Goode*, 341 N.C. at 529, 461 S.E.2d at 640-41 (citations omitted).

The record shows that Agent Tulley had extensive training and experience in crime-scene collection and processing. She earned a bachelor's degree in criminology, during which she took a crime-lab class, and a master's degree in criminal justice. She also had numerous hours of training in crime-scene collection and processing at the State Bureau of Investigation (SBI). She specializes in forensic crime-scene collection and processing at the SBI, and she has testified as a crime-scene specialist in well over seventy-five cases. This education and experience clearly put her in a "better position to have an opinion on the subject than is the trier of fact." *Id.* at 529, 461 S.E.2d at 640. Moreover, Agent Tulley's opinions were not based solely on blood-spatter evidence. The record shows her opinions were deduced from a combination of the blood spatters, the location of Dr. Delaney's glasses, the relationship between the body and the door, and the location of the wounds on Dr. Delaney's head. These were all

matters within Agent Tulley's experience and knowledge base. As a result, it was reasonable for the trial court to find that Agent Tulley's education, training and experience placed her in a position to assist the jury in understanding the crime-scene evidence. Thus, the trial court's admission of this testimony was not an abuse of discretion, and defendant's assignment of error is overruled.

[8] The defendant next assigns error to the trial court's admission of Ms. Cora Cobb's testimony regarding the defendant. Ms. Cobb, the defendant's aunt, testified at trial that defendant twice told her that he wished Mrs. Delaney were dead by stating, "That bitch is back. I hate that bitch. I wish she was dead," or words to that effect. After objection by defense counsel, the district attorney admitted that these exact words were never disclosed to the defense and that the defense did not know about the phrase containing the death wish. The trial court admitted the statement notwithstanding, finding that the "substance" of the statement had been revealed to the defense. We agree with the trial court.

Defendant argues that the district attorney's failure to disclose the sentence, "I wish she was dead," was a violation of the State's discovery obligations under N.C.G.S. § 15A-903. Section 15A-903(a)(2) provides in relevant part:

> (a) Statement of Defendant.—Upon motion of a defendant, the court must order the prosecutor:
>
> . . . .
>
> (2) To divulge, in written or recorded form, the substance of any oral statement relevant to the subject matter of the case made by the defendant, regardless of to whom the statement was made, within the possession, custody or control of the State, the existence of which is known to the prosecutor or becomes known to him prior to or during the course of trial . . . .

N.C.G.S. § 15A-903(a)(2) (1988). The express language of the statute mandates only that the district attorney provide defense counsel with the "substance" of the defendant's statement. We stated in *State v. Bruce*, 315 N.C. 273, 337 S.E.2d 510 (1985), that " 'substance' means: 'Essence; the material or essential part of a thing, as distinguished from "form." That which is essential.' " *Id.* at 280, 337 S.E.2d at 515 (quoting *Black's Law Dictionary* 1280 (5th ed. 1979)). In this case, the record shows that the district attorney told the defense that Ms.

Cobb planned to testify that the defendant had called the victim a "bitch" and that he had said he "hated Geraldine Delaney." The essence of Ms. Cobb's testimony was that defendant had an intense dislike—a hatred—for Mrs. Delaney. Whether that dislike was expressed by saying he "hated" her, that she was a "bitch," or that he "wished she was dead," the defense was still conveyed the substance of her planned testimony. As this Court stated in *State v. Pridgen*, 313 N.C. 80, 326 S.E.2d 618 (1985):

> We believe that it would be unreasonable, if not impossible, for a prosecutor to anticipate the exact testimony of a witness. Additional details omitted under the stress or other circumstances of an initial interview may be recalled when the witness is later interviewed in preparation for trial. Moreover no witness can be expected to repeat verbatim on the stand what he or she has previously stated during interviews. Where, as in the present case, trial testimony is *substantially similar* to what in substance was provided during discovery, and variations are attributable to the addition or elaboration of detail or merely changes in vocabulary or syntax, the testimony is admissible, and in full compliance with our discovery rules.

*Id.* at 91, 326 S.E.2d at 625.

Moreover, whether a party is issued sanctions for failure to comply with discovery rules is in the discretion of the trial court. *State v. Tucker*, 329 N.C. 709, 717, 407 S.E.2d 805, 810 (1991). In *Tucker*, we discussed the principles underlying discovery rules:

> The purpose of these procedures is to protect the defendant from unfair surprise. *State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990), *cert. denied*, [498] U.S. [1092], 112 L. Ed. 2d 1062 (1991); *State v. Alston*, 307 N.C. 321, 331, 298 S.E.2d 631, 639 (1983). Whether a party has complied with discovery and what sanctions, if any, should be imposed are questions addressed to the sound discretion of the trial court. *State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988). "[The] discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the state in its noncompliance with the discovery requirements." *State v. McClintick*, 315 N.C. 649, 662, 340 S.E.2d 41, 49 (1986).

*Tucker*, 329 N.C. at 716-17, 407 S.E.2d at 809-10. The record shows that the trial court held an extensive hearing on the statement in question. A preview of the evidence on *voir dire* was given in which

both parties examined the witness, and the trial court heard legal arguments from both sides. Thereafter, the trial court made findings of fact and conclusions of law supporting its decision. No showing of bad faith on the part of the State was made. Because the record shows that the trial court thoroughly considered the admissibility of the statement at issue and because there is competent evidence in the record to support the trial court's exercise of discretion, we are bound by the trial court's finding, and we find no abuse of discretion. *State v. Mills*, 332 N.C. 392, 405, 420 S.E.2d 114, 120 (1992). Thus, defendant's assignment of error on this issue is overruled.

[9] In his next assignment of error, defendant asserts that the trial court erred by failing to instruct the jury on voluntary manslaughter. Defendant contends that the testimony of Ms. Deborah Hartman raised the issue of voluntary manslaughter and that, relying on *State v. Mustafa*, 113 N.C. App. 240, 245, 437 S.E.2d 906, 908-09, *cert. denied*, 336 N.C. 613, 447 S.E.2d 409 (1994), the trial court must charge on a lesser-included offense whenever there is some evidence that might convince a rational trier of fact to convict of that lesser offense. We find defendant's contention unpersuasive.

It is well-settled law in this state that when a jury is properly instructed on both first-degree and second-degree murder and returns a verdict of guilty of first-degree murder, the failure to instruct on voluntary manslaughter is harmless error. *State v. Lyons*, 340 N.C. 646, 663-64, 459 S.E.2d 770, 780 (1995). This is precisely what happened in the present case. The fact that Ms. Hartman's testimony may have raised the possibility of voluntary manslaughter is thus irrelevant to our analysis of this issue. As a result, defendant's assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[10] In his first assignment of error regarding his capital sentencing proceeding, defendant asserts that it was improper for the trial court to submit both robbery and pecuniary gain as aggravating circumstances. Citing *State v. Quesinberry*, 319 N.C. 228, 240, 354 S.E.2d 446, 453 (1987), defendant argues that these two aggravating circumstances are redundant when a premeditated murder is committed during a robbery. We find the circumstances of this case do not merit the application urged by defendant.

It is established law in North Carolina that it is error to submit two aggravating circumstances when the evidence to support each is

precisely the same. *State v. Gibbs*, 335 N.C. 1, 58-59, 436 S.E.2d 321, 354 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994); *State v. Jennings*, 333 N.C. 579, 627-28, 430 S.E.2d 188, 213-14, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Conversely, where the aggravating circumstances are supported by separate evidence, it is not error to submit both to the jury, even though the evidence supporting each may overlap. *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993); *State v. Jones*, 327 N.C. 439, 452, 396 S.E.2d 309, 316 (1990).

To prove a robbery, the State need only establish that the defendant feloniously took money or goods of any value from the person of another against that person's will by violence or by putting that person in fear. *State v. Daniels*, 337 N.C. 243, 267, 446 S.E.2d 298, 313 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). The desire for pecuniary gain is not an essential element of robbery, and not all robberies are committed for pecuniary gain. *State v. Richardson*, 342 N.C. 772, 467 S.E.2d 685, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 160 (1996).

In this case, the evidence shows that the defendant murdered the victims while engaged in two robberies. The defendant committed the murders not only in the course of stealing money from the victims, but also in the course of stealing the keys to the victims' car. While there is evidence of a pecuniary gain motive in the theft of the money, there is no evidence that the motive for the theft of the car keys was pecuniary gain. The evidence shows the defendant stole the keys in order to use the car as transportation either to visit his girlfriend or to evade law enforcement, not in order to sell the car and convert it into cash. The theft of the money supports the pecuniary gain aggravating circumstance, and the theft of the keys supports the robbery aggravating circumstance. Because the record establishes that the aggravating circumstances in question were not supported by "precisely the same evidence," *Gibbs*, 335 N.C. at 58-59, 436 S.E.2d at 354, the trial court did not err by submitting both to the jury. As a result, defendant's assignment of error is overruled.

[11] Defendant's next assignment of error involves the prosecutors' arguments to the jury. Defendant contends that the prosecutors injected impermissible personal opinion and argued facts not in evidence, in violation of defendant's rights under statutory and constitutional law. The most objectionable argument, according to the defendant, was the vouching by the prosecutors for the truth of

their case. We do not agree with defendant's contentions in this regard.

In *State v. Worthy*, 341 N.C. 707, 462 S.E.2d 482 (1995), this Court summarized the law regulating closing arguments:

> It is well settled that arguments of counsel rest within the control and discretion of the presiding trial judge. *State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992); *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). In the argument of hotly contested cases, counsel is granted wide latitude. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. While it is not proper for counsel to "travel outside the record" and inject his or her personal beliefs or other facts not contained within the record into jury arguments, or place before the jury incompetent or prejudicial matters, counsel may properly argue all the facts in evidence as well as any reasonable inferences drawn therefrom. *State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 (1975).

> Additionally, as this Court has previously pointed out, "for an inappropriate prosecutorial comment to justify a new trial, it 'must be sufficiently grave that it is prejudicial error.' " In order to reach the level of "prejudicial error" in this regard, it now is well established that the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

> *State v. Green*, 336 N.C. 142, 186, 443 S.E.2d 14, 40 (citations omitted), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994). Moreover, "prosecutorial statements are not placed in an isolated vacuum on appeal." *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds* by *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995).

*Worthy*, 341 N.C. at 709-10, 462 S.E.2d at 483-84. Also, alleged error in the prosecution's arguments must be evaluated in the context of the defendant's arguments. *State v. Gladden*, 315 N.C. 398, 423, 340 S.E.2d 673, 689, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). Finally, where a party does not object to a jury argument, the allegedly improper argument must be so prejudicial and grossly improper as to interfere with defendant's right to a fair trial in order

for the trial court to be found erroneous for failure to intervene *ex mero motu. State v. Alford,* 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995).

When measured by these standards, a thorough examination of the record establishes that the prosecutors' statements in this case do not rise to such a level as to constitute an interference with defendant's right to a fair trial. One of the arguments to which defendant assigns error was the questioning of the defendant's claim that Dr. Delaney threatened him with a knife. The prosecution argued:

> [Dr. Delaney was] [m]uch different than the defendant. His son described him as a man of peace. Mr. Harold Delaney, 5'8 1/2", 168 pounds according to the autopsy. A man 5'8 1/2". A man of peace. Do you really believe that this man [the defendant] was threatened? And if he was threatened was he threatened with this knife? This man threatened with this knife? Is that the truth?

> Mr. Collins in his closing arguments told you that he wanted a verdict that spoke the truth. So do we. We would never ask you to convict if we did not believe it was the truth. And we believe the same way, we ask you to go back to the jury room and bring back a verdict that does speak the truth.

The defendant contends that this constitutes impermissible injection of personal opinion by the prosecutor. However, when viewed in the context of the arguments of both sides, it is apparent that the prosecutor's objective with this argument was to admonish the jury to do exactly what the defense had already asked—to return a verdict that spoke the truth—and that the prosecution would never ask the jury to do otherwise. Moreover, the defense repeatedly questioned the prosecution's integrity and the truthfulness of its witnesses during the defendant's closing arguments. Therefore, it cannot be said that the prosecution's defense of its case and its witnesses was grossly improper within the context of these facts. As a result, the prosecution's arguments were not so grossly improper as to have required the trial court to intervene *ex mero motu* or to have deprived the defendant of a fair trial. This assignment of error is overruled.

[12] In his next assignment of error, defendant contests the trial court's submission of the heinous, atrocious, or cruel aggravating circumstance to the jury. Defendant cites *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979), for the proposition that "[b]y using the word 'especially' the legislature indicated that there must be evidence that

STATE v. EAST

[345 N.C. 535 (1997)]

the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection." 298 N.C. at 25, 257 S.E.2d at 585. Defendant then asserts that the heinous, atrocious, or cruel aggravating circumstance was improper in this case because the evidence only showed that the victims died as a result of one to four blows to the head and that this does not rise to the level established by precedent for submission. We disagree.

The standard for submission of aggravating circumstances under N.C.G.S. § 15A-2000 is as follows:

> It is well settled that the trial court must consider the evidence in the light most favorable to the State when determining the sufficiency of the evidence to support this aggravating circumstance. The State is entitled to every reasonable inference to be drawn from the evidence; contradictions and discrepancies are for the jury to resolve; and all evidence admitted that is favorable to the State is to be considered.

*State v. Robinson*, 342 N.C. 74, 85-86, 463 S.E.2d 218, 225 (1995) (citations omitted), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 793 (1996). A murder is properly characterized as especially heinous, atrocious, or cruel when it is a " 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.' " *Burr*, 341 N.C. at 307, 461 S.E.2d at 626 (quoting *Goodman*, 298 N.C. at 25, 257 S.E.2d at 585). The fact that the murder involves a brutal attack which inflicts injuries beyond those necessary to kill the victim evidences an especially heinous, atrocious, or cruel murder. *Burr*, 341 N.C. at 307, 461 S.E.2d at 626. Also, murders that are physically agonizing or otherwise dehumanizing to the victims are appropriately considered especially heinous, atrocious, or cruel. *State v. Lynch*, 340 N.C. 435, 473, 459 S.E.2d 679, 698 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 558 (1996). Other factors also go into deciding whether a murder is especially heinous, atrocious, or cruel, such as the brutality of the assault, *State v. Huffstetler*, 312 N.C. 92, 115-16, 322 S.E.2d 110, 125 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985), or the advanced age of the victims, *Williams*, 339 N.C. at 52, 452 S.E.2d at 275.

In this case, the evidence showed that the Delaneys—two diminutive, peaceful persons in their seventies—were beaten to death in their own home by their 260-pound nephew with a blunt-force object. Each of them suffered several wounds in their futile attempts to defend themselves. In the course of their struggle, they were cut and

beaten so as to cause extreme pain and suffering. The autopsy showed that the esteemed Dr. Delaney was struck at least fourteen separate times, and his "tiny" wife was struck at least ten or eleven separate times, many of the blows coming after they were on the ground. The Delaneys were beaten by the defendant so severely and so mercilessly that their bones were crushed, their skulls were fractured exposing brain tissue and Mrs. Delaney's finger was completely amputated. Afterward, the defendant rifled through their belongings, stole their money and fled the state in their car. Based on this evidence, it is beyond intelligent debate that the trial court was correct in allowing the jury to consider whether these murders were especially heinous, atrocious, or cruel. Thus, defendant's assignment of error to the contrary is overruled.

[13] Defendant next asserts that the jury's failure to find in mitigation that defendant was under the influence of a mental or emotional disturbance was erroneous and was a violation of his rights to due process and a fair trial. Defendant argues that the jury was required to consider this mitigating circumstance since the trial court decided a peremptory instruction was justified and since there was no evidence that contradicted a finding of the circumstance. We conclude there was no error in either the trial court's submission of this circumstance or the jury's consideration of and failure to find it.

In *State v. Alston*, 341 N.C. 198, 461 S.E.2d 687 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996), this Court discussed the relative duties of the trial court and jury regarding mitigating circumstances:

> In those cases where the evidence is truly uncontradicted, the defendant is, *at most*, entitled to a peremptory instruction when he requests it. *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). A peremptory instruction tells the jury to answer the inquiry in the manner indicated by the trial court *if it finds* that the fact exists as all the evidence tends to show. *Id.* at 75, 257 S.E.2d at 617. . . . [E]ven where all of the evidence supports a finding that the mitigating circumstance exists and a peremptory instruction is given, *the jury may nonetheless reject the evidence and not find the fact at issue if it does not believe the evidence. Id.*

> The jury's failure to find this statutory mitigating circumstance does not indicate that the jury was prevented from or failed to consider it. To the contrary, this mitigating circumstance

was submitted, thus, the jury was required to consider it. The jury simply declined to find that the evidence supported this mitigating circumstance.

*Alston*, 341 N.C. at 256, 461 S.E.2d at 719-20 (emphasis added).

In the present case, the trial court gave the following peremptory instruction in his charge on the murder of Dr. Delaney:

> I instruct you, ladies and gentlemen, that all of the evidence tends to show that this murder was committed while the defendant was under the influence of mental or emotional disturbance. And therefore, as to this circumstance I charge that if one or more of you find the facts to be as all the evidence tends to show you would so indicate by having your foreman write "Yes" in the space provided after this mitigating circumstance on the Issues and Recommendation form. However, if none of you find this circumstance to exist, even though there is no evidence to the contrary, then you would so indicate by having your foreman write "No" in that space.

The trial court gave an identical instruction on this mitigating circumstance in its charge on the murder of Mrs. Delaney. However, the jury did not find that defendant committed the crimes while he was under the influence of mental or emotional distress, as it was entitled to do under these instructions and under the law. It is impossible to determine the extent of the jury's consideration of this mitigating circumstance. However, such an inquiry is beyond our authority and beyond a proper consideration of this issue. The only relevant inquiry is whether the trial court issued a peremptory instruction if requested. That occurred. Consequently, the jury's conclusion that it should not find this mitigating circumstance does not constitute reversible error, and defendant's assignment of error is overruled.

## PRESERVATION ISSUES

Defendant assigns as error, for the sake of preservation, the following: denial of defendant's motion for individual *voir dire* and sequestration of the jury during *voir dire*; denial of defendant's alternative motion for small group *voir dire* and sequestration for the remainder of the jury pool; denial of defendant's motion to declare the death penalty unconstitutional; the constitutional challenge to the especially heinous, atrocious, or cruel aggravating circumstance as standardless; the constitutional challenge to the course of conduct aggravating circumstance as standardless; the use of the word "may"

in sentencing Issue Three; and the general challenges to N.C.G.S. § 15A-2000. The defendant concedes this Court has consistently rejected these claims of error, and he fails to otherwise argue or brief these assignments of error. Nevertheless, we have thoroughly reviewed the record and these issues in light thereof, and we find no compelling reason to depart from our prior rulings on these issues. Accordingly, defendant's assignments of error here are overruled.

## PROPORTIONALITY REVIEW

Having found no error in either the guilt/innocence phase of defendant's trial or the capital sentencing proceeding, it is now our duty to determine (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (Supp. 1996).

In the present case, the defendant was convicted of first-degree murder upon the theory of malice, premeditation, and deliberation. The jury found the aggravating circumstances that the murder was committed by the defendant while the defendant was engaged in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murder was part of a course of conduct in which the defendant engaged and the course of conduct included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). We conclude that the evidence supports the aggravating circumstances found by the jury. We further conclude, based on our thorough review of the record, transcript and briefs, that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

[14] The final statutory duty of this Court is to conduct a proportionality review. One purpose of proportionality review is to guard against the "capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Another "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988).

**STATE v. EAST**

[345 N.C. 535 (1997)]

In conducting proportionality review, we compare this case to others in the pool, defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), as being those that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

The case *sub judice* has several distinguishing characteristics: The jury convicted the defendant of two counts of first-degree murder under the theory of malice, premeditation, and deliberation; the murders were found by the jury to be especially heinous, atrocious, or cruel; the jury found three additional aggravating circumstances; the victims were two elderly persons; the victims were beaten to death by a family member in their own home in the course of a robbery; and the victims suffered numerous defensive wounds and likely experienced great pain before death. These characteristics distinguish this case from those in which we have held the death sentence disproportionate.

Of the cases in which this Court has found the death penalty disproportionate, only two involved the especially heinous, atrocious, or cruel aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). Both *Stokes* and *Bondurant* are distinguishable from this case.

In *Stokes*, the seventeen-year-old defendant, along with four accomplices, robbed the victim and beat him to death. This Court found the sentence of death disproportionate because of the defendant's young age and because the defendant received the death penalty while an older accomplice received only a life sentence. *Stokes*, 319 N.C. at 21, 352 S.E.2d at 664. By contrast, the defendant's age is not a mitigating circumstance in the present case. Here, the thirty-four-year-old defendant, without the aid of an accomplice, beat the two victims to death.

In *Bondurant*, the defendant shot the victim while they were riding together in a car. This Court found the death penalty disproportionate because the defendant immediately exhibited remorse and

concern for the victim's life by directing the driver to go to the hospital. The defendant went into the hospital to secure medical help for the victim, voluntarily spoke to police and admitted shooting the victim. *Bondurant,* 309 N.C. at 694, 309 S.E.2d at 182-83. In the present case, the defendant showed no remorse for the victims and testified he could not remember killing the Delaneys, even though he told his girlfriend on 4 August 1994 that the Delaneys were dead. Additionally, the defendant did not seek medical help for the victims, and he fled the state in an attempt to elude law enforcement. Thus, we find no significant similarity between this case and *Stokes* or *Bondurant.*

As noted above, four aggravating circumstances were found by the jury. Of the cases in which this Court has found a sentence of death disproportionate, the jury found the existence of more than one aggravating circumstance in only two cases, *Bondurant* and *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985). *Bondurant,* as discussed above, is clearly distinguishable. In *Young,* this Court focused on the jury's failure to find the existence of the especially heinous, atrocious, or cruel aggravating circumstance. The present case is distinguishable from *Young* because, here, the jury found the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. For all of the foregoing reasons, we conclude that the cases in which this Court has found the death penalty disproportionate are distinguishable from the instant case.

In performing proportionality review, it is also appropriate for us to compare the case before us to other cases in which we have found the death sentence to be proportionate. *State v. McCollum,* 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 895 (1994). Although we review all of the cases in the pool when engaging in our statutory duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* Here, it suffices to say that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. This case especially resembles *State v. Chandler,* 342 N.C. 742, 467 S.E.2d 636, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 133 (1996). In that case, an elderly victim was beaten to death in her home. The beating to death of multiple elderly victims places defendant in the pool of multiple murderers that this Court consistently has found to merit the death penalty. *State v. McLaughlin,* 341 N.C. 426, 462 S.E.2d 1 (1995),

*cert. denied,* —— U.S. ——, 133 L. Ed. 2d 879 (1996); *State v. Rose,* 339 N.C. 172, 451 S.E.2d 211 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 818 (1995).

Based on the nature of this crime and the defendant, and particularly the distinguishing features noted above, we conclude as a matter of law that the sentence of death is neither excessive nor disproportionate. We conclude that the defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.