HUNTER, JR., ROBERT N., Judge.
 

 *476
 
 Rodney Lee Enoch ("Defendant") appeals from a 16 September 2016 judgment after a jury convicted him of one count of first degree
 
 *547
 
 murder. Following the jury verdict,
 
 [1]
 
 the trial court sentenced Defendant to life imprisonment, without parole. Defendant asserts the trial court erred by: (1) not allowing him to rehabilitate jurors; (2) admitting evidence of two prior abusive relationships; (3) instructing the jury it could use prior assaults on the victim to show identity; (4) admitting an irrelevant and prejudicial document; (5) allowing the victim's skeleton to be displayed to the jury by denying his mistrial motion; and (6) denying him a fair trial due to cumulative error. We find no prejudicial error.
 

 I. Factual and Procedural Background
 

 On 14 October 2013, an Alamance County Grand Jury indicted Rodney Lee Enoch ("Defendant") on one count of first degree murder.
 

 A. Jury Selection
 

 On 15 August 2016, the trial court called Defendant's case for trial, and jury selection began. The State questioned a prospective juror, Terrance Copling. Copling stated he was familiar with Defendant's family, though he did not know Defendant himself. Copling stated he thought he could be impartial and fair to both sides in the case. When the State later pressed Copling, however, he admitted "having the connection to [Defendant's] dad or knowing his dad in the past ... will probably cause issues ...." The State made a motion to dismiss Copling as a juror for cause. Defendant asked the trial court for leave to rehabilitate Copling, in order to keep him on the jury. The court denied Defendant's request, and stated "[t]his is not a capital case." The trial court asked Copling, "Is it your position that due to your knowledge of the defendant's family that you could not fairly evaluate the evidence presented to you and be impartial to the State and the defendant?" Copling answered in the affirmative. Answering a clarifying question, Copling clearly agreed his feelings were "so strong" he could not be impartial. The trial court allowed the State's challenge for cause and excused Copling over Defendant's objection.
 

 *477
 
 Outside the presence of the prospective jury, the trial court told Defendant he was "not entitled to ask questions to rehabilitate in any fashion[ ]" because "this [wa]s not a capital case." Defendant objected and argued, "I don't think whether it's capital or non-capital makes any difference." Defendant also noted he wished to rehabilitate other jurors, but did not "because [he] understood the [c]ourt's ruling to be that because it's not a capital case [he] wouldn't be able to ...." The court reiterated it had already ruled on the issue, but noted Defendant preserved the issue for the record.
 

 After a brief recess, the trial court stated in pertinent part:
 

 Just so there's no ambiguity at all on what the [c]ourt ruled upon with respect to the defendant's last objection regarding the juror Terrance Copling, we were having a conversation but I want to make sure the record is clear as to what the Court's rationale was for its ruling.
 

 It has long been my understanding that in capital cases the defendant is entitled to rehabilitate jurors on the question of death qualification only and that's the only provision that I'm aware of that requires and does give the defendant such an opportunity.
 

 As to questioning of jurors when the other party has the juror, it's long been my belief that the system was designed to at least potentially allow for that but it's generally not done. In my discretion I chose not to do it because, again, this is not a capital case. The rehabilitation question [is] only allowed-only required in capital cases.
 

 ... [T]he Court has exercised its discretion and will allow the parties to ask questions when they have the jurors and the other party will not be allowed ask questions during that aspect of the process.
 

 B. Trial Court's General Findings of Fact
 

 The evidence presented at trial led the court to find the following by a preponderance
 
 *548
 
 of the evidence: Debra Dianne Sellars ("Sellars") was last seen on 20 April 2012. Sellars' children reported her missing on 24 April 2012. Defendant was Sellars' on-again, off-again boyfriend. On 16 December 2011, Defendant assaulted Sellars. Defendant pleaded guilty to the assault. On 3 October 2012, a hunter discovered human skeletal remains in a wooded area on the property of 4280 Union Ridge Road, Burlington, North Carolina. DNA analysis confirmed the remains
 
 *478
 
 belonged to Sellars. Sellars' assailant stabbed her to death and deposited her body at 4280 Union Ridge Road. Defendant objected to the trial court's findings of fact.
 

 C. Testimony at Trial
 

 The State called Chelsea Sellars ("Chelsea"), Sellars' daughter. Chelsea first met Defendant in 2011 when he dated her mother. For a period of time in late 2011, Defendant lived with Sellars, Chelsea, and Sellars' son Deandre Terrell ("Andre"). During that period, Chelsea noticed her mother's "face look[ed] a little different on occasion" due to heavier makeup application. From the time Defendant moved out, sometime in late 2011, to 20 April 2012, Chelsea did not notice her mother interacting with any other men. On 20 April 2012, a Friday, Chelsea got dressed for school, told her mother goodbye, and went to the bus stop at 7:30 a.m. When Chelsea got home from school on Friday around 3:15 p.m., her mother was not home. Over the weekend, Chelsea stayed in her room and played video games. She knew her mother was not home, "but it wasn't unusual for her to be gone over the weekend." On Monday, Chelsea became concerned when her mother still did not come home. On Tuesday, Chelsea went to school and informed her teacher "that [her] mother hadn't returned home over the weekend nor that Monday." The teacher sent Chelsea to the counselor who then contacted the police.
 
 [2]
 

 The State called Andre. While Defendant and Sellars were dating, Andre recalled seeing his mother with a black eye and bruises on her face and neck. Andre later asked his mother if she was still seeing Defendant, and Sellars said "no." Andre suspected his mother still accepted phone calls from Defendant. On 20 April 2012, Andre stayed home from work with his mother. Around 4:00 p.m., Sellars received a phone call. Andre heard Sellars talking to "a male voice" from the other room, and he heard his mother say "that [she] will meet [them] at the hotel." Andre did not recognize the voice as Defendant's. Andre then told his mother he had to be at work the next morning. Sellars said she would be back in the morning so Andre could use the van to get to work. Sellars left around 5:00 p.m. Andre did not see or speak to his mother again. Andre called his mother later the same night to remind her he needed the car for work in the morning. Sellars did not pick up the phone, and she was not
 
 *479
 
 home the next morning at 6:00 a.m. when Andre got up for work. Andre continued to call his mother throughout weekend. On Saturday, Sellars' phone rang, and then went to voicemail. On Sunday and Monday, Sellars' phone went straight to voicemail without ringing.
 

 The State called Justin Curtis ("Curtis"), an employee of a car dealership in Greensboro, North Carolina. In 2012, Curtis lived in Burlington, North Carolina, at his parents' house, located next to 4280 Union Ridge Road. In October 2012, Curtis went deer hunting on the land next door. While surveying the land for signs of deer, Curtis saw something with a "bright, cream color" in the woods. Curtis didn't initially realize he discovered human remains. Curtis "pick[ed] up the skull" and took it back to his parents' house, leaving the other remains behind. Curtis then called the Sheriff's Department. When a police officer arrived, with gloves on he picked up the skull and took it to his vehicle. A second officer then arrived with a K-9 unit, and Curtis took the officers to the location of the other human remains. Curtis identified the remains he saw on a photograph displayed for the court.
 

 In
 
 voir dire
 
 , the State indicated it intended to "put some of the remains into evidence."
 

 *549
 
 The State explained its "plan was to enter the skull, the ribs, and the femur." The remains were in a box and not individually labeled. The State argued it was "only entering what [it] felt [was] necessary for this trial." Defendant objected to the relevancy and evidentiary value of the skeletal remains, aside from "the four ribs." Specifically, Defendant argued Curtis would not be able to identify the skull as the one he found in the woods. Defendant also argued the State gained nothing from showing the skull, because no expert witness drew any conclusions from it. As to the State introducing the femur as a source of DNA, Defendant argued the actual femur added nothing to previously provided photographs.
 

 The State countered "every single remain" had relevance to the case. Specifically, the State argued the skull was relevant "because that goes with [Sellars] and that also helps identify her and identify her race." Without Curtis' identification of the skull, other witnesses would not be able to identify any of the remains. The trial court determined "403 and 401 [balancing] at this point are premature in my view because [the State's] not going to be moving it into evidence [at this time]." Defendant replied, "Then I have a question about how this witness can [identify the skull] and I would ask that at least the State do it in voir dire outside the presence of the jury." At the trial court's allowance, the State then broke the seal on the box during
 
 voir dire
 
 . Curtis identified Sellars' skull "by the two front teeth" as the skull he found
 
 *480
 
 in the woods. The State then moved to enter the skull into evidence. Defendant again objected to the relevancy of the skull. Defendant also argued the skeletal remains, on the whole, were not necessary to establish the victim's identity because "things were done with that evidence that identified her."
 

 After a brief recess,
 
 voir dire
 
 continued, and Defendant motioned for the Court to release the remains to Sellars' family. Defendant then waived all issues on chain of custody as to the remains. The State argued the court could not release the remains until after trial, because the State needed the evidence to prove its case. The State offered the following reasons to support the relevancy of the skeletal remains:
 

 [T]he jury can look at the side by side comparisons of her photograph to the skull. I'm required to prove that someone died.
 

 Dr. Ann Ross did examine all of the remains used. To determine how she died she had to go through each of the remains. As I mentioned in my opening and as she will testify that she had to go through each of the remains to see if there were any injuries on that.
 

 And in addition, the family, you know, wants me to prove my case. They know that they will get her remains, whatever is left, you know, when the case is over, so they're not requesting those remains at this time. And just as I previously mentioned, you know, all of them would be relevant. They were all found there at the scene at that time.
 

 The trial court found admission of Sellars' skeletal remains into evidence would not be duplicative of photographs on the record. The trial court then held the skull's evidentiary value was "not substantially outweighed by the danger of unfair prejudice[,]" and thus "admissible pursuant to Rules 401, 403 and 402."
 
 [3]
 
 After
 
 voir dire
 
 , the State pulled the skull out of the box, and Curtis identified the skull for the jury. Defendant renewed his relevancy objection. The trial court overruled Defendant's objection, and received the skull into evidence.
 

 The State called Dr. Ann Ross, director of the Forensic Sciences Institute at North Carolina State University. The trial court tendered Dr. Ross as an expert in the field of forensic anthropology. Dr. Ross
 
 *481
 
 conducted trauma analysis on each individual bone of the completely skeletonized remains. Dr. Ross noted only very small bones were missing from the "almost" complete skeleton of the decedent. Dr. Ross then assembled all twelve of Sellars' left rib bones on a table in front of the jury. Dr. Ross explained the process of "lay[ing] all the remains in [an]
 
 *550
 
 anatomical position" so she could "go through everything ... to see if there [are] fractures or any type of evidence on there ...." Out of the set of the left twelve rib bones, Dr. Ross noted four were "completely fractured in half." The fractures were not due to animal activity and indicated four penetrating slits made by a sharp instrument. Dr. Ross concluded the pattern of the cuts on the rib bones was consistent with Sellars being stabbed multiple times with a knife. Dr. Ross then assembled the right rib bones on the table next to the left ribs. She noted animal activity damaged the right rib bones. The trial court then invited the jurors to "without comment ... step down and see" the bones assembled on the table in front of them. Four out of fifteen jurors stepped down and examined the rib bones. After the trial court noted it "[saw] no further indication that the jurors wish[ed] to see this array of ribs[,]" the court then directed Dr. Ross to put the rib bones back into their packaging.
 

 Outside the presence of the jury, Defendant argued "a distinct odor" filled the courtroom each time the State opened the box of remains. The trial court and Dr. Ross did not notice the odor. Defendant continued to object to the display of Sellars' bones in the courtroom.
 

 In
 
 voir dire
 
 , Dr. Ross admitted this was her first time displaying the actual bones of a deceased victim in front of a jury. Typically, Dr. Ross used anonymous skeletons of deceased persons, who voluntarily donated their bodies to science, to instruct the jury. Defendant renewed his motion to return the remains to the family, then moved for a mistrial. The court denied both motions.
 

 With the jury back in the courtroom, the State moved the left and right rib bones into evidence. Defendant renewed his objections. The trial court overruled Defendant's objections, and the court received the ribs into evidence.
 

 The State then brought in a separate hanging anatomical skeleton for Dr. Ross to demonstrate the pattern of injury from another angle. Dr. Ross normally used this hanging skeleton to explain her findings to a jury. Dr. Ross showed the placement of Sellars' earlier described injuries to the jury, as marked by red stickers on the hanging skeleton.
 

 The State called Dr. Clay Nichols, a medical examiner. Dr. Nichols performed Sellars' autopsy and concluded Sellars died by four stab
 
 *482
 
 wounds that struck her left lung and heart. Dr. Nichols declared the death was a homicide.
 

 The State called Dr. George Maha, Associate Vice President and Laboratory Director of the DNA Identification Testing Division of Laboratory Corporation of America in Burlington, North Carolina. The trial court tendered Dr. Maha as an expert witness. At his lab in Burlington, Dr. Maha cut off a piece of the deceased's femur for DNA testing. Dr. Maha's DNA test of the femur revealed a 99.9999% probability the bones belonged to Sellars. The State moved to enter the femur into evidence. The trial court admitted and received the femur into evidence over Defendant's renewed objection.
 

 The State called Brian Phillips ("Officer Phillips"), an officer with the Burlington Police Department. On 16 December 2011, Phillips met Sellars when she came to the police department. Sellars told Phillips "she had just been assaulted by her boyfriend at the time." Sellars identified Defendant as her assailant. She described the incident to Phillips as a "verbal altercation" which resulted in her "getting punched in the face two to three times and then struck on top of her head with a frozen pack of hamburger meat." Based on Sellars' visible injuries, Phillips went to the magistrate and obtained a warrant on Defendant for the assault.
 
 [4]
 
 Phillips advised Sellars she could obtain a protective order against Defendant. Phillips noted Sellars seemed "hesitant, reluctant" throughout their conversation. Phillips last saw Sellars at the court date for the assault charge against Defendant. Defendant did not object to this testimony regarding Defendant's previous assault charges.
 

 Outside the presence of the jury, the trial court told Defendant it "would be willing to give a limited instruction if it were requested"
 

 *551
 
 on testimony regarding Defendant's previous assaults. The trial court suggested a pattern limiting instruction; Defendant then objected to the court's suggestion. Specifically, Defendant objected to the limiting instruction for purposes of identity and intent. Over Defendant's objection, the trial court instructed the jury as follows:
 

 [E]vidence has been received tending to show that on or about December the 16[th] of 2011, [and] on other non-specified occasions prior to this date, that the defendant, had engaged in assaultive actions against Debra Dianne Sellars. This evidence was received solely for the purposes of showing the identity of the person who committed the
 
 *483
 
 crime charged in this case, if it was committed; that the defendant had the intent, which is a necessary element of the crime charged in this case; and that the defendant acted with malice, which is a necessary element charged in this case.
 

 If you believe this evidence you may consider it but only for the limited purposes for which it has been received. You may not consider it for any other purpose[.]
 

 The State called Kali Marsh ("Marsh"), former employee of Family Abuse Services ("FAS"). FAS is a nonprofit agency that helps domestic violence victims. On 2 April 2012, Sellars went to FAS seeking to file a protective order against Defendant. Sellars reported to Marsh that on 1 April 2012, Defendant had continuously harassed her over the phone. Sellars also described to Marsh a previous incident the year before. Sellars said in December 2011, Defendant "had physically assaulted her by hitting her, choking her and placing a pillow over her face." Sellars and Marsh had a short conversation, and Marsh did not have a chance to go over safety planning with Sellars. Marsh did not see Sellars again.
 

 The State called Natalie Snowden ("Snowden"), an investigative analyst with the Criminal Investigation Division of the Burlington Police Department. Snowden determined Defendant's cell phone records indicated he called Sellars around sixty-six times between 18 April 2012 and 20 April 2012. On 20 April 2012, Defendant called Sellars at 8:35 p.m. After 20 April 2012, Defendant did not call Sellars.
 

 The State then called Shelia Daye ("Daye"), Sellar's little sister. On 24 April 2012, Daye learned her sister was missing and tried to help the police find her. While looking through Sellars' belongings, Daye found a handwritten letter. The letter was on loose-leaf paper and was "folded in a book where [Sellars] didn't want nobody to find it." The State showed Daye the letter Sellars wrote. Daye recognized Sellars' handwriting as her sister's.
 

 Outside the presence of the jury, Defendant argued the letter was not relevant and lacked a proper foundation. The State argued the letter was relevant because it spoke to Sellars' state of mind before she went missing. The State suggested the jury could infer the date of the letter from its references to Defendant's assault of Sellars in December 2011. The trial court found the letter relevant due to its "significant internal references" to Defendant's "assaultive behavior" towards Sellars. The court also found the probative value of the letter significantly outweighed the
 
 *484
 
 danger of unfair prejudice. The court admitted Sellars' handwritten letter into evidence, and the State published copies of the letter to the jury.
 

 In
 
 voir dire
 
 , the State called Cornelia Crisp ("Crisp"), Defendant's ex-girlfriend with whom he had a son in 1993. Crisp met Defendant in 1989, and shortly thereafter they began dating. After the first year of dating, Defendant "started getting controlling[,]" and would "smack" Crisp around. Crisp and Defendant lived together for about seven years. Crisp recalled several times when Defendant hit her in the face while she drove him in her car.
 

 One particular evening, Defendant and Crisp left a club arguing.
 
 [5]
 
 Defendant took Crisp "out in the country and dragged [her] out of the car and took [her] out in a field on
 
 *552
 
 Union Ridge Road." Defendant proceeded to "jump" on Crisp in the snow and beat her in the head with his fists. Defendant told Crisp "he would kill [her][,]" and "that he could get rid of [her]" so no one would find her. The next day, Crisp went to the doctor after feeling sick and feverish. Crisp then found out from the doctor she was three months pregnant. Crisp noted Defendant took her to "that area" near Union Ridge Road about three times over the course of their relationship, and upon reaching that location, he would drag her out of the car and beat her.
 

 Crisp tried to leave Defendant several times. Defendant would call her job and "pop up" at her friend's house to find her. On several occasions while dating Defendant, Crisp would wake up in the hospital with a black eye and bruises. Crisp did not report the incidents to anyone. Defendant left Crisp when he met Tamara Lewis.
 

 At the close of Crisp's testimony, the trial court asked the State its alleged purposes for Crisp's testimony. The State said, "Some of the purposes include [Defendant's] modus operandi, malice, lack of accident, his motive, his opportunity. ... His plan, intent, which is the same as malice. Common plan or scheme." Defendant argued the State's alleged purposes were "nothing more than a laundry list." Defendant claimed Crisp's testimony had "nothing to do with Dianne Sellars[,]" given the assaults on Crisp occurred about twenty years prior and did not involve a weapon. The State conceded some of Crisp's testimony could stay out, but "the other similarities ... [were] just too numerous[.]" The trial court delayed ruling on the admission of Crisp's testimony until after it heard Tamara Lewis' testimony for context.
 

 *485
 
 The State then called Tamara Lewis ("Lewis"), Defendant's ex-wife and mother of two of his children. During
 
 voir dire
 
 , Lewis described her marriage to Defendant as "pretty good[,]" until "[t]he abuse" started after her son was born in September 1996. After Lewis told Defendant she wanted a divorce, Defendant "put [her] in a head lock and beat [her] several times in the head" with his fists. Lewis described Defendant as controlling and abusive; when she tried to move away from him he would always follow. Defendant often left bruises and knots on Lewis. One time, after Defendant struck Lewis with a belt, Lewis called the police. He had also choked her. A court sentenced Defendant to domestic violence counseling for the incident.
 

 Lewis moved to a different town to get away from Defendant. In 1999 on Christmas Eve, a roommate brought Lewis and her children back into town to see their father for Christmas. At Defendant's mother's house, Defendant told Lewis he wanted her and the children to stay with him at a hotel for the night. Lewis told Defendant she would not stay with him. Defendant did not let Lewis leave and became "aggravated." Lewis then woke up Defendant's mother and told her Defendant would not let her leave. Defendant then took the phone off the hook and asked Lewis to go "in the back with him." Lewis refused. Defendant grabbed Lewis, threw her down on the floor, and stabbed her repeatedly with an ice pick, which injured her eye, neck, ear, and shoulder-all in front of Lewis's two-year-old son, who tried to pull Defendant off of Lewis. When Defendant went into the kitchen to get a "bigger knife," Defendant's mother helped Lewis go out the back door. Lewis ran to her car where her roommate was in the driver's seat with the car running. Defendant ran out of the front door "with another knife" and chased Lewis to the car. Lewis jumped in the car, and her roommate locked the doors. As Lewis and her roommate started to leave, Defendant "just took the knife that he had and started stabbing the window with it ...." Lewis described the first "knife" Defendant used to stab her with as "an ice pick," and described the second "knife" Defendant used as "a bigger carving knife." Lewis sustained "a couple of nicks on [her] ear and on [her] ... right shoulder." Defendant pleaded guilty to one count of assault inflicting serious injury, and one count of second degree kidnapping for the incident.
 

 At the close of Lewis's testimony, the trial court asked Defendant if he wished to be heard on his objection. Defendant stated, "Nothing that Ms. Lewis talked about is comparable in any way to the crime charged except the-potentially the incident involving
 
 *553
 
 the stabbing and Christmas in 1999." Defendant further argued the December 1999
 
 *486
 
 incident was possibly generically similar, but not sufficiently similar for admission under Rule 404(b). The State countered that Defendant had a discernable pattern of assault against women he dated, and thus Lewis's testimony showed Defendant's potential motive for attacking Sellars. The trial court found both Lewis and Crisp's testimonies regarding Defendant's "assaultive behavior" more probative than prejudicial, and admissible for 404(b) purposes. Lewis and Crisp then testified in front of the jury, pursuant to the trial court's orders and limiting instructions.
 

 The State rested. Defendant neither testified nor offered evidence; the trial court charged the jury not to let that influence its decision. Defendant moved to dismiss for insufficient evidence, and in the alternative moved for the case to proceed on second degree murder. The trial court denied the motion on each. The jury found Defendant guilty of first degree murder. The trial court sentenced Defendant to life without parole.
 

 II. Standards of Review
 

 A. Trial Court's Discretion Regarding Jury Rehabilitation
 

 This Court "must defer to the trial court's judgment as to whether the prospective juror could impartially follow the law."
 
 State v. Bowman
 
 ,
 
 349 N.C. 459
 
 , 471,
 
 509 S.E.2d 428
 
 , 436 (1998),
 
 cert. denied
 
 ,
 
 527 U.S. 1040
 
 ,
 
 119 S.Ct. 2403
 
 ,
 
 144 L.Ed.2d 802
 
 (1999). Accordingly, we review the trial court's decision to not allow Defendant to rehabilitate certain jurors for abuse of discretion.
 
 White v. White
 
 ,
 
 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985) ("It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion."). An abuse of discretion occurs when "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988).
 

 B. Rule 404(b) Rulings
 

 "When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling ... we look to whether the evidence supports the findings and whether the findings support the conclusions."
 
 See
 
 N.C. Gen. Stat. § 8C-1, R. Evid. 404(b) (2017). We review
 
 de novo
 
 the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)."
 
 State v. Beckelheimer
 
 ,
 
 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 158-59 (2012). Any potential evidentiary error on appeal is deemed "harmless unless a defendant proves that absent the error a different result would have been reached at trial."
 

 *487
 

 State v. Ferguson
 
 ,
 
 145 N.C. App. 302
 
 , 307,
 
 549 S.E.2d 889
 
 , 893,
 
 disc. review denied
 
 ,
 
 354 N.C. 223
 
 ,
 
 554 S.E.2d 650
 
 (2001).
 

 C. Rule 403 Rulings
 

 This Court reviews a trial court's admission of evidence under Rule 403 of the North Carolina Rules of Evidence for abuse of discretion if appellant properly preserved the issue for appeal.
 
 State v. Miles
 
 ,
 
 223 N.C. App. 160
 
 , 164,
 
 733 S.E.2d 572
 
 , 575 (2012) (citing
 
 State v. McCray
 
 ,
 
 342 N.C. 123
 
 , 131,
 
 463 S.E.2d 176
 
 , 181 (1995) );
 
 see
 
 N.C. Gen. Stat. § 8C-1, R. Evid. 403 (2017). Generally, an issue is properly preserved if the party: (1) makes a timely objection at trial; (2) gives specific grounds for the objection; and (3) obtains a ruling denying the request. N.C. R. App. 10(a)(1) (2017). Specifically, a timely objection requires appellant to object when the evidence is actually introduced at trial.
 
 State v. Snead
 
 ,
 
 368 N.C. 811
 
 , 816,
 
 783 S.E.2d 733
 
 , 737 (2016) (citations omitted). Additionally, appellant must object in the jury's presence.
 
 Id
 
 . at 816,
 
 783 S.E.2d at 737-38
 
 ("An objection 'only during a hearing out of the jury's presence prior to the actual introduction of the testimony' is insufficient.") (quoting
 
 State v. Thibodeaux
 
 ,
 
 352 N.C. 570
 
 , 581-82,
 
 532 S.E.2d 797
 
 , 806 (2000) ).
 

 An abuse of discretion occurs when the trial court's ruling is "manifestly unsupported by reason."
 
 State v. Graham
 
 ,
 
 200 N.C. App. 204
 
 , 207,
 
 683 S.E.2d 437
 
 , 440 (2009) (citation omitted). On appeal, appellant "must demonstrate a reasonable possibility that, but for the admission of this evidence, the jury would have reached a different result."
 
 Id.
 
 at 207-08,
 
 683 S.E.2d at 440
 
 (citation
 
 *554
 
 omitted);
 
 see also
 

 Ferguson
 
 ,
 
 145 N.C. App. at 307
 
 ,
 
 549 S.E.2d at 893
 
 .
 

 III. Analysis
 

 Defendant contends the trial court committed the following errors: (1) not allowing Defendant to rehabilitate jurors; (2) admitting evidence of two prior abusive relationships; (3) instructing the jury it could use prior assaults on the victim to show identity; (4) admitting an irrelevant and prejudicial document; (5) allowing the victim's skeleton to be displayed to the jury by denying his mistrial motion; and (6) denying him a fair trial due to cumulative error. Pursuant to Rule 28 of the North Carolina Rules of Appellate Procedure, we do not consider Defendant's cumulative error argument.
 
 State v. Bellamy
 
 ,
 
 172 N.C. App. 649
 
 , 662,
 
 617 S.E.2d 81
 
 , 91 (2005) (holding this Court is not required to consider evidence for cumulative error when appellant sparsely, and sometimes unrelatedly, objects as a continuing objection at trial). We consider Defendant's other five arguments in turn.
 

 *488
 

 A. Trial Court's Discretion Regarding Jury Rehabilitation
 

 Defendant assigns error to the trial court for not allowing the defense the opportunity to rehabilitate jurors. Defendant contends this action was improper in that it amounted to a "blanket ruling" as to the court's inability to act. We decline to find such violations.
 

 Our Supreme Court has held "[a] defendant has no right to attempt to rehabilitate jurors, and the trial court is not required to allow a defendant to rehabilitate jurors for cause."
 
 State v. East
 
 ,
 
 345 N.C. 535
 
 , 547,
 
 481 S.E.2d 652
 
 , 660 (1997) (citing
 
 State v. Burr
 
 ,
 
 341 N.C. 263
 
 , 281-82,
 
 461 S.E.2d 602
 
 , 611 (1995) ),
 
 cert. denied
 
 ,
 
 517 U.S. 1123
 
 ,
 
 116 S.Ct. 1359
 
 ,
 
 134 L.Ed.2d 526
 
 (1996) ). "The trial court retains discretion as to the extent and manner of questioning, and its decisions will not be overturned absent an abuse of discretion."
 

 Id.
 

 at 547
 
 ,
 
 481 S.E.2d at
 
 660 (citing
 
 State v. Wilson
 
 ,
 
 313 N.C. 516
 
 , 526,
 
 330 S.E.2d 450
 
 , 459 (1985) ).
 

 This Court has determined in noncapital cases that a trial court has discretion when considering whether to allow rehabilitation during
 
 voir dire
 
 .
 
 See
 

 State v. Jones
 
 ,
 
 151 N.C. App. 317
 
 , 323,
 
 566 S.E.2d 112
 
 , 116 (2002) (
 
 appeal dismissed
 
 by
 
 State v. Jones
 
 ,
 
 356 N.C. 687
 
 ,
 
 578 S.E.2d 320
 
 (2003) N.C. LEXIS 284 (2003) (
 
 cert. denied
 
 by
 
 Jones v. North Carolina
 
 ,
 
 540 U.S. 842
 
 ,
 
 124 S.Ct. 111
 
 ,
 
 157 L.Ed.2d 76
 
 ,
 
 2003 U.S. LEXIS 5726
 
 (U.S., Oct. 6, 2003) (finding a challenge to a potential juror for cause was supported by her answers in the record, and defendant failed to show further questioning would produce different responses);
 
 accord
 

 State v. Crummy
 
 ,
 
 107 N.C. App. 305
 
 , 323,
 
 420 S.E.2d 448
 
 , 458 (1992).
 

 Here, looking to the totality of the
 
 voir dire
 
 , there is no evidence that the trial court ruled out the possibility of rehabilitation. At first the trial court told Defendant he was "not entitled to ask questions to rehabilitate in any fashion[ ]" because "this [wa]s not a capital case," but later the trial court allowed for the possibility of rehabilitation. To the trial court's questions of prospective juror Copling about his ability to be fair and impartial, based on Copling's knowledge of Defendant's family, Copling expressed an inability to follow the law. Defendant also wanted to rehabilitate prospective juror Clapp, believing the State's questions had confused her and she could follow the law. The trial court overruled the objection "based upon what the Court chose to do in its discretion and excused her for cause."
 

 Rather than disallowing rehabilitation of any jurors, the court clarified its understanding of the law, explaining rehabilitation was "potentially allow[ed]" but "generally not done" in noncapital cases. That the court disallowed defense counsel's requests for rehabilitation does not,
 
 *489
 
 in the absence of other evidence, amount to a de facto "blanket" ruling against all rehabilitation efforts.
 
 See
 

 East
 
 ,
 
 345 N.C. at 547
 
 ,
 
 481 S.E.2d at 660-61
 
 (trial court's correct application of law led to preclusion of all rehabilitation efforts). The trial court properly exercised its discretion in disallowing Defendant's request to rehabilitate jurors; this assignment of error is therefore overruled.
 
 *555
 

 B. Admission of Testimonial Evidence
 

 Defendant next assigns error to the admission of the testimonies of Cornelia Crisp and Tamara Lewis regarding prior abusive relationships.
 

 Evidence Rule 404(b) provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith [but] may ... be admissible for other purposes[.]" N.C. Gen. Stat. § 8C-1, R. Evid. 404(b) (2017). Our Supreme Court has held Rule 404(b)
 

 states a clear general rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.
 

 State v. Coffey
 
 ,
 
 326 N.C. 268
 
 , 278-79,
 
 389 S.E.2d 48
 
 , 54 (1990). Evidence considered for admission under Rule 404(b) should be "carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused."
 
 State v. Al-Bayyinah
 
 ,
 
 356 N.C. 150
 
 , 154,
 
 567 S.E.2d 120
 
 , 122 (2002) (citing N.C. Gen. Stat. § 8C-1, Rule 404(a) ). Thus, "the rule of inclusion ... is constrained by the requirements of similarity and temporal proximity."
 
 Id
 
 . at 154,
 
 567 S.E.2d at 123
 
 .
 

 "When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value."
 
 State v. Artis
 
 ,
 
 325 N.C. 278
 
 , 299,
 
 384 S.E.2d 470
 
 , 481 (1989),
 
 sentence vacated on other grounds
 
 ,
 
 494 U.S. 1023
 
 ,
 
 110 S.Ct. 1466
 
 ,
 
 108 L.Ed.2d 604
 
 (1990). In order to be sufficient for admission of prior-crimes evidence under Rule 404(b), "similarities between the two incidents need not be 'unique and bizarre,' " but the similarities must tend to support " 'a reasonable inference that the same person committed both the earlier and later acts.' "
 
 State v. Sneeden
 
 ,
 
 108 N.C. App. 506
 
 , 509-10,
 
 424 S.E.2d 449
 
 , 451 (1993) (quoting
 
 State v. Stager
 
 ,
 
 329 N.C. 278
 
 , 304,
 
 406 S.E.2d 876
 
 , 891 (1991) ).
 

 *490
 
 Temporal proximity "must be considered in light of the specific facts of each case and the purposes for which the evidence is being offered."
 
 State v. Hipps
 
 ,
 
 348 N.C. 377
 
 , 405,
 
 501 S.E.2d 625
 
 , 642 (1998),
 
 cert. denied,
 

 525 U.S. 1180
 
 ,
 
 119 S.Ct. 1119
 
 ,
 
 143 L.Ed.2d 114
 
 (1999). "[T]he passage of time between the commission of the two acts slowly erodes the commonality between them[.]"
 
 State v. Jones
 
 ,
 
 322 N.C. 585
 
 , 590,
 
 369 S.E.2d 822
 
 , 824 (1988). Further, "where the perpetrator's identity [i]s in question," there must be "significant similarities and little passage of time between incidents."
 
 State v. Scott
 
 ,
 
 318 N.C. 237
 
 , 247,
 
 347 S.E.2d 414
 
 , 420 (1986).
 

 When evaluating temporal proximity, the passage of time during which acts occurred should be considered as a whole rather than as individual incidents. In
 
 State v. Frazier
 
 , for example, defendant objected to the trial court's admission of testimony, where there was a period of prior sexual abuse against multiple victims spanning twenty-six years, and ending seven years before the crime of sexual abuse at issue in the trial.
 
 344 N.C. 611
 
 , 615,
 
 476 S.E.2d 297
 
 , 300 (1996). The Supreme Court explained the "testimony in question tended to prove that defendant's prior acts of sexual abuse occurred continuously over a period of approximately twenty-six years and in a strikingly similar pattern."
 
 Id
 
 . at 616,
 
 476 S.E.2d at
 
 300 ;
 
 see also
 

 State v. Shamsid-Deen
 
 ,
 
 324 N.C. 437
 
 , 447,
 
 379 S.E.2d 842
 
 , 848 (1989) (holding no error for trial court to admit testimony of prior sexual misconduct occurring during a twenty-year period);
 
 State v. Penland
 
 ,
 
 343 N.C. 634
 
 , 644,
 
 472 S.E.2d 734
 
 , 735 (1996), (
 
 cert. denied
 
 ,
 
 519 U.S. 1098
 
 ,
 
 117 S.Ct. 781
 
 ,
 
 136 L.Ed.2d 725
 
 (1997) ) (holding ten-year span between crimes charged and prior bad acts did not render the evidence so remote in time as to negate the existence of a common plan or scheme).
 

 Before admitting the respective testimonies, the trial court conducted a
 
 voir dire
 
 hearing pertaining to Defendant's assaults on the two women. Crisp's
 
 voir dire
 
 hearing testimony and trial testimony were similar, yet during
 
 voir dire
 
 she was less clear about certain sequential and road location specifics. During
 
 voir dire
 
 , Crisp told the court about
 
 *556
 
 several incidents of abuse. Crisp testified that during all three incidents, Defendant was "[a]ngry, ... [v]ery upset." Lewis'
 
 voir dire
 
 hearing testimony and trial testimony were substantially similar.
 

 The trial court ruled certain assaults on Crisp were admissible, and certain assaults on Lewis were admissible. The trial court entered two separate detailed orders concluding Crisp and Lewis' testimonies were admissible under Rule 404(b) for the purpose of showing identity, malice, intent, motive, and
 
 modus operandi
 
 , and the evidence should not be excluded under Rule 403. The trial court also overruled Defendant's objections. Through a limiting instruction on Crisp and Lewis' testimony,
 
 *491
 
 the court excluded evidence of "generalized conflict[s]" between Defendant and the women.
 

 Here, substantial evidence of similarity among the prior bad acts and the crime charged exists. The trial court's factual findings show similarities in Defendant's actions as to all three women. The assaults on Crisp and Lewis were similar to the one perpetrated on Sellars in 2011. Defendant's assaults on Crisp were similar to those resulting in Sellars' murder. In both instances, the domestic relationship was violent.
 

 The trial court's findings of fact identified comparative location similarities between the prior crimes evidence of Defendant's activities with Crisp and Lewis. Defendant drove Crisp in her car and hit her in the head with his fist. He dragged Crisp out of her car and across a field through high grass, then assaulted her, hitting her in the head and kicking her. In another incident, Defendant likewise dragged Crisp out of the car and beat her. Although Crisp had some difficulty identifying which specific acts occurred at which specific locations, Defendant assaulted her in isolated locations in Alamance County. The area was also isolated where Defendant drove around with Lewis when he was angry. Although no evidence showed Defendant took Sellars, while alive, to isolated locations on multiple occasions, Sellars' remains were found on one of the roads in an isolated area where Defendant drove, dragged, and assaulted Crisp. Evidence showed Sellars' body had been dragged through brush before being left there.
 

 Defendant's argument that Lewis' stabbing with an ice pick was merely "a very generic similarity," insufficient for admission per Rule 404(b), fails. Though Defendant claims "there were no features common to the ice pick/knife incident," an inference is reasonable that the same person committed both the earlier and later acts. Defendant stabbed Lewis when he became angry; he admitted to police he knew where to "poke" Lewis without killing her.
 

 Although the exact nature of Sellars' killing was unknown, the evidence surrounding Sellars' death is admissible to prove Defendant's identity. On the last night Sellars was seen with Defendant, he had rented a hotel room. After Sellars decided she would not go with him, she was stabbed to death with a knife. By Defendant's own admission about Lewis, he would know exactly where to stab Sellars to kill her.
 

 Defendant also asserts a lack of evidence showing the motive and cause of Sellars' murder was anger and control. In all three of Defendant's relationships pertinent to this case, however, assaults and harmful behaviors were triggered by anger, control, and conflict. It is
 
 *492
 
 reasonable to infer such issues motivated and caused Defendant to murder Sellars.
 

 Evidentiary similarities indicate both Lewis and Crisp's testimony is relevant to show intent and motive, and indicate the same person, Defendant, committed the prior assaults on Crisp and Lewis, and Sellars' murder. On this basis, the evidence was properly admitted.
 

 Defendant contends there were "no 'striking similarities' between the prior acts" and Sellars' death, and such "remoteness of the prior acts weighs heavily in favor of exclusion." Supporting his argument, Defendant relies on
 
 State v. Jones
 
 ,
 
 322 N.C. 585
 
 , 591,
 
 369 S.E.2d 822
 
 , 825 (1988) (holding a seven-year gap between assaultive sexual abuse incidents made the prior crimes inadmissible as proof of common scheme or plan, despite considerable similarities between the prior crimes and the charged crimes) and
 
 *557
 

 State v. Shane
 
 ,
 
 304 N.C. 643
 
 , 656,
 
 285 S.E.2d 813
 
 , 821 (1982) (holding even though there was a "striking similarity" between prior and current sexual offense acts, the seven months between the prior act and the crimes charged "substantially negated the plausibility of the existence of an ongoing and continuous plan to engage persistently in such ... activities").
 

 In
 
 State v. Hipps
 
 , defendant argued the prior crime, a second-degree murder that occurred in 1978, was too remote in time to be relevant to any aspect of the murder for which he was being tried.
 
 348 N.C. 377
 
 , 403,
 
 501 S.E.2d 625
 
 , 641 (1998),
 
 cert. denied,
 

 525 U.S. 1180
 
 ,
 
 119 S.Ct. 1119
 
 ,
 
 143 L.Ed.2d 114
 
 (1999). Defendant maintained the error was prejudicial since the jury likely used the evidence for improper purposes.
 

 Id.
 

 ,
 
 348 N.C. at 403
 
 ,
 
 501 S.E.2d at
 
 641 ;
 
 see
 
 N.C. Gen. Stat. § 8C-1, Rule 404(b). Since the time lapse between the prior crime and the crime charged was seventeen years, defendant argued it was too remote to be admissible under Rule 404(b). The Supreme Court explained, "[r]emoteness for purposes of 404(b) must be considered in light of the specific facts of each case and the purposes for which the evidence is being offered ... [f]or some 404(b) purposes, remoteness in time is critical to the relevance of the evidence for those purposes; but for other purposes, remoteness may not be as important."
 

 Id.
 

 ,
 
 348 N.C. at 403
 
 ,
 
 501 S.E.2d at
 
 641 ;
 
 see
 
 N.C. Gen. Stat. § 8C-1, Rule 404(b). The Court further explained "time may be significant" when introducing prior-crime evidence to show "both crimes arose out of a common scheme or plan," but "remoteness is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident."
 

 Id.
 

 ,
 
 348 N.C. at 403
 
 ,
 
 501 S.E.2d at 641
 
 . The
 
 Hipps
 
 Court concluded the "time lapse between the crimes goes to the weight of evidence, not to its admissibility."
 

 Id.
 

 ,
 
 348 N.C. at 403
 
 ,
 
 501 S.E.2d at 641
 
 .
 

 *493
 
 Here, the evidence of prior crimes was admitted to show motive, intent, modus operandi, and identity. The testimony tended to show Defendant's assaults on Crisp occurred from 1990-1993, and those on Lewis from 1996-1999. Sellars' death in 2012 leaves an apparent stretch of approximately thirteen years. Both the State and Defendant agreed to subtract the four years Defendant spent in prison from calculating the passage of time between assaults, resulting in an apparent nine-year gap. The assaults on multiple victims over time, with relatively short gaps in between, show a pattern of behavior. In
 
 voir dire
 
 , Crisp testified as to her belief that she was able to leave Defendant because he met Lewis-his next victim. We conclude, considering the similarities and pattern of assaults, the time lapse between Defendant's assaults on Crisp and Lewis and Sellars' murder was temporal enough to justify admissibility.
 

 Defendant also argues Crisp and Lewis' testimonies provided only a "slight" value when compared to the "substantial prejudice engendered by the testimony," in violation of Evidence Rule 403. Assuming without deciding this issue is preserved, the argument lacks merit. Demonstrating the weighing of evidence under the Rule 403 balancing test, the trial court conducted a
 
 voir dire
 
 hearing, heard arguments from the parties, limited the admission of Lewis and Crisp's testimony, entered a detailed order, and gave limiting instructions. Given the similarity of the assaults, our view that the lapse in time was not so great as to limit the admissibility of evidence, and the overwhelming evidence against Defendant, we find no error in the admission of Crisp and Lewis' testimony and no abuse of discretion.
 

 C. Admission of Prior Assaults to Show Identity
 

 Defendant next assigns error to the trial court's instructing the jury it could use evidence of prior assaults on Sellars to show identity. According to Defendant, the evidence was irrelevant and inadmissible under Rule 404(b) for that purpose and only showed his violent propensity.
 

 Multiple trial witnesses testified regarding Defendant's abuse of Sellars, prior to her murder, including the December 2011 assault she reported to Officer Phillips. At trial, Defendant did not object to the testimony, but stated outside the presence of the jury that the evidence was admissible only to show malice. Following Officer Phillips' testimony,
 
 *558
 
 and after being prompted by the trial court, Defendant requested a limiting instruction. The State requested the trial court include in the instruction intent, motive, malice, and identity, among others, so that evidence of Defendant's assaults on Sellars could be considered. The
 
 *494
 
 trial court ruled the evidence was relevant to show identity, intent, and malice, and it passed the Rule 403 balancing test. Defendant objected to identity and intent. The trial court then entered an order overruling Defendant's objection.
 

 Defendant argues there is a dissimilarity of assault evidence from the charged crime that would make jurors make an impermissible inference that because Defendant assaulted Sellars, he is a violent person and must have killed her.
 

 Defendant objected to the limiting instruction, but not to the evidence, its limited admissibility, or its use in proving identity. His argument on appeal is thus waived.
 
 See
 
 N.C. R. App. P. 10(a)(1). Even if preserved, Defendant's argument is meritless, and any error was not prejudicial. Sufficient similarities exist here to infer Defendant was the perpetrator of both the prior crimes and the charged offense.
 
 See
 
 N.C. Gen. Stat. 8C-1, R. Evid. 404(b) ;
 
 see also
 

 Stager
 
 ,
 
 329 N.C. at 304
 
 ,
 
 406 S.E.2d at 890-91
 
 . Defendant's prior assaults and the murder for which he was on trial involved the same victim, Sellars. They arose in the context of the exact same relationship, one in which Defendant used violence to control Sellars' behavior. Defendant harassed Sellars, calling her several times a day during the week before the murder. During the afternoon of her disappearance, Andre heard Sellars talking to a man over the telephone about meeting at a hotel. Defendant admitted Sellars ultimately decided against that meeting. Similarities were sufficient to infer Defendant perpetrated both the prior assaults on Sellars and her murder. The trial court properly admitted evidence of Defendant's prior assaultive behavior toward Sellars for the purpose of showing identity.
 

 On appeal, Defendant did not argue that the other purposes for which the trial court instructed the jury it could consider his prior assaults on Sellars-intent, motive, and malice-were improper. Given the overwhelming evidence against Defendant, there is no prejudice.
 
 See
 
 N.C. Gen. Stat. § 15A-1443(a).
 

 D. Admission of Handwritten Document
 

 Defendant argues the trial court erred by admitting an "irrelevant and overly prejudicial document" written by Sellars. Defendant asserts the document references past events that are inadmissible under Rule 803(3). N.C. Gen. Stat. § 8C-1, R. Evid. 803(3) (2017).
 

 Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable
 
 *495
 
 or less probable than it would be without the evidence." Whether evidence is relevant is a question of law, thus we review the trial court's admission of the evidence
 
 de novo
 
 . Defendant bears the burden of showing that the evidence was erroneously admitted and that he was prejudiced by the error.
 

 State v. Kirby
 
 ,
 
 206 N.C. App. 446
 
 , 456,
 
 697 S.E.2d 496
 
 , 503 (2010) (citations omitted). "Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand."
 
 Stager
 
 ,
 
 329 N.C. at 314
 
 ,
 
 406 S.E.2d at 897
 
 (citation omitted).
 

 Under Rule 403, "relevant [ ] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, R. Evid. 403. Rule 803(3) provides "[a] statement of the declarant's then existing state of mind" is admissible as an exception to the hearsay rule, but not "a statement of memory or belief to prove the fact remembered or believed[.]" N.C. Gen. Stat. § 8C-1, R. Evid. 803(3).
 

 The handwritten document at issue contained a list of things Sellars was going to tell Defendant. Defendant objected to the admission of the document, outside the presence of the jury, based on lack of foundation
 
 *559
 
 and relevance. Defendant claims it is irrelevant as to Sellars' state of mind on or about the time of Sellars' death, because there was an approximate four month period of time between the reference to Defendant hitting Sellars with frozen meat on 16 December 2011 and Sellars' disappearance on or about 20 April 2012. Supporting the argument that the document references past events, Defendant relies on
 
 State v. Hardy
 
 for the proposition that certain statements in Sellars' letter are "merely a recitation of facts which describe various events," as opposed to "statement[s] of [the victim's] then existing state of mind[.]"
 
 See
 

 State v. Hardy
 
 ,
 
 339 N.C. 207
 
 , 228,
 
 451 S.E.2d 600
 
 , 612 (1994). According to Defendant, the State's presentation of the letter was meant solely to be prejudicial. A trial court's ruling will be reversed on appeal, however, "only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision."
 
 Kirby
 
 ,
 
 206 N.C. App. at 457
 
 ,
 
 697 S.E.2d at 503
 
 (citation omitted).
 

 Assuming without deciding Defendant's argument is preserved, we find his argument without merit. The statements in the letter far exceed a mere recitation of events. The document references a time frame as to
 
 *496
 
 Defendant hitting Sellars on the head with frozen meat, which occurred on 16 December 2011. Moreover, the document reflected Sellars was "choked," had her "air cut[ ] off," "begged for [her] life, and was without "heat in the middle of winter," statements from which a trial court could reasonably determine the documents showed her state of mind. Defendant presents no evidence this is not a reasonable conclusion nor that the trial court abused its discretion in any way. Defendant's assignment of error is, therefore, without merit, and the trial court did not err.
 

 E. Admission of Skeletal Remains
 

 Defendant also assigns error to the trial court's admission of Sellars' skeletal remains. First, Defendant claims the trial court erred in admitting the evidence under Rule 403, because Sellars' skeletal remains were more prejudicial than probative. Second, Defendant claims the trial court violated his due process rights by allowing repetitive display of the bones to the jury. Lastly, Defendant claims the trial court erred by denying his mistrial motion. We consider only the first claim, because it is the easiest burden for Defendant to meet. If Defendant cannot prove the trial court abused its discretion in admitting the evidence generally under 403 balancing, then he logically cannot meet the plain error standard of a due process claim. Additionally, the mistrial motion is moot if the court properly admitted the evidence under Rule 403 as more probative than prejudicial.
 

 Rule 403 of the North Carolina Rules of Evidence states relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, R. Evid. 403. " 'Unfair prejudice' means an undue tendency to suggest a decision on an improper basis, usually an emotional one."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 283,
 
 372 S.E.2d 523
 
 , 526 (1988) (quoting
 
 State v. Mason
 
 ,
 
 315 N.C. 724
 
 , 731,
 
 340 S.E.2d 430
 
 , 435 (1986) ). When reviewing a trial court's Rule 403 evidentiary ruling, we generally give great deference to the "sound discretion" of the trial court.
 
 State v. Graham
 
 ,
 
 200 N.C. App. 204
 
 , 207,
 
 683 S.E.2d 437
 
 , 440 (2009) (quoting
 
 State v. Coffey
 
 ,
 
 326 N.C. 268
 
 , 281,
 
 389 S.E.2d 48
 
 , 56 (1990) ) (quotation marks omitted). Thus, evidence that illustrates witness testimony is generally found to be competent so long as its relevant.
 
 See
 

 State v. Lloyd
 
 ,
 
 354 N.C. 76
 
 , 100,
 
 552 S.E.2d 596
 
 , 615 (2001) (holding admission of victim's bloody clothing was not unduly prejudicial because it was relevant).
 

 *497
 
 Sellars' skull, left ribs, right ribs, and right femur were offered and admitted into evidence at different points during the State's case in chief. Defendant properly objected to each individual bone at the appropriate time, and thus we review for an abuse of discretion.
 
 [6]
 

 *560
 
 Defendant argues the State submitted Sellars' skeletal remains into evidence "to excite the sympathies or to inflame the passions of the jury." North Carolina case law suggests if the only effect of evidence is to excite prejudice or sympathy, then the trial court abused its discretion when it admitted such evidence.
 
 See e.g.
 
 ,
 
 State v. Simpson
 
 ,
 
 299 N.C. 335
 
 , 346,
 
 261 S.E.2d 818
 
 , 825 (1980) (holding trial court erred in admitting during a murder trial evidence that defendant sodomized a dog). In order to determine whether the admission of Sellars' skeleton only excited prejudice and sympathy, we consider the State's purported rationale for each contested set of bones. If there is an established relevant reason for each, we generally defer to the trial court's discretion on relevancy.
 
 See
 

 White v. White
 
 ,
 
 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985).
 

 First, we consider the trial court's admission of Sellars' skull. The trial court's admission of a homicide victim's skull is an issue of first impression for this Court.
 
 [7]
 
 Generally, evidence used to identify a victim is relevant and admissible at trial.
 
 State v. Eason
 
 ,
 
 328 N.C. 409
 
 , 421,
 
 402 S.E.2d 809
 
 , 814-15 (1991) (holding no error to admit victim's little finger into evidence when used to identify charred victim). In
 
 State v. Williams
 
 , this Court held physical evidence of "a segment of skin from the victim's right leg bearing a tattoo design of a Cobra" was not overly prejudicial and properly established the identity of the victim.
 
 17 N.C. App. 39
 
 , 43,
 
 193 S.E.2d 452
 
 , 454 (1972),
 
 cert. denied
 
 ,
 
 282 N.C. 675
 
 ,
 
 194 S.E.2d 155
 
 (1973). The Court concluded defendant's argument "that the segment of skin should have been photographed and the photograph
 
 *498
 
 used as evidence so as to minimize adverse effect on the jury[ ]" was without merit.
 
 Id.
 
 at 43,
 
 193 S.E.2d at 455
 
 .
 

 In the instant case, the State claimed the skull proved the victim's identity and race. The State further argued it needed Curtis, the hunter who found the skull, to identify it so other witnesses could later identify other pertinent bones. Curtis positively identified the skull as the one he found, based on its two front teeth. Defendant waived all chain of custody arguments, so we assume the skull established a chain of custody to bring in the other pertinent remains to prove the State's case. As in
 
 Williams
 
 , where a segment of skin from the victim's right leg was not overly prejudicial,
 
 see
 

 17 N.C. App. at 43
 
 ,
 
 193 S.E.2d at 454
 
 , here the admitted skull was relevant to the State's case and illustrated Curtis' testimony. Though we may have found other means of establishing Sellars' identity sufficient, the admission of the skull was more probative than prejudicial and properly admitted under Rule 403.
 
 See
 
 N.C. Gen. Stat. § 8C-1, R. Evid. 403.
 

 Next, we consider the admission of the rib bones. Evidence showing the nature and number of a victim's wounds is sufficiently probative under our case law.
 
 State v. Hager,
 

 320 N.C. 77
 
 , 82-83,
 
 357 S.E.2d 615
 
 , 618 (1987) (stating "the nature and number of the victim's wounds is also a circumstance from which premeditation and deliberation can be inferred") (citation omitted);
 
 see also
 

 State v. Austin
 
 ,
 
 320 N.C. 276
 
 , 295,
 
 357 S.E.2d 641
 
 , 653 (1987) (concluding nature and number of victims' multiple gunshot wounds showed premeditation). Here, the State used the rib bones to illustrate Sellars' injuries, which the medical examiner later concluded caused her death. Accordingly, the rib bones were more probative than prejudicial and properly admitted under Rule 403. N.C. Gen. Stat. § 8C-1, R. Evid. 403.
 

 *561
 
 Lastly, we consider the admission of the femur. Biological items used in DNA testing are generally admissible in North Carolina under North Carolina General Statute section 8C-1, Rule 702(a).
 
 State v. Williams
 
 ,
 
 355 N.C. 501
 
 , 553-54,
 
 565 S.E.2d 609
 
 , 640 (2002). Our Supreme Court has held DNA evidence is highly probative under Rule 403.
 
 State v. Daughtry
 
 ,
 
 340 N.C. 488
 
 , 512,
 
 459 S.E.2d 747
 
 , 759 (1995). Here, the State used the femur to establish the identity of the deceased through DNA testing. Accordingly, the femur was highly probative and properly admitted under Rule 403. N.C. Gen. Stat. § 8C-1, R. Evid. 403.
 

 In light of the bones' relevancy, we conclude the trial court did not abuse its discretion in admitting Sellars' skeletal remains into evidence and publishing them to the jury.
 
 See
 

 *499
 

 Quedens v. State
 
 ,
 
 280 Ga. 355
 
 ,
 
 629 S.E.2d 197
 
 (2006) (The Supreme Court of Georgia concluded admitting skeletal remains of the victim into evidence, and publishing the skeleton to the jury, was not overly prejudicial in a murder trial.). We ultimately defer to the trial court's discretion because Defendant failed to show prejudice.
 
 See
 

 State v. Graham
 
 ,
 
 200 N.C. App. 204
 
 , 207-08,
 
 683 S.E.2d 437
 
 , 440 (2009) (citing
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 287,
 
 372 S.E.2d 523
 
 , 528 (1988) ). Defendant did not prove that had the skeletal remains not been admitted, a reasonable possibility existed the jury would have reached a different result.
 
 Id.
 
 at 207-08,
 
 683 S.E.2d at 440
 
 . Because we find no prejudicial error in the trial court's admission of Sellars' remains, Defendant's remaining claims on this topic are moot.
 

 IV. Conclusion
 

 For the reasons stated herein, we hold Defendant has not shown prejudicial error.
 

 NO PREJUDICIAL ERROR.
 

 Judges ELMORE and ZACHARY concur.
 

 [1]
 

 The record on appeal indicates the Alamance County Clerk of Superior Court could not locate the actual verdict sheet from trial.
 

 [2]
 

 Burlington Police Department Officer Dana Mitchell spoke with Chelsea on Tuesday, 24 April 2012. Mitchell immediately called his supervisor because "it didn't seem like a normal missing person kind of case to [him]." Mitchell also entered Sellars' name into the NCIC database as a "missing person."
 

 [3]
 

 The trial court noted Defendant objected to the skull on the basis of 401 and 403, not on the basis of chain of custody via 402 because Curtis actually recognized the skull.
 

 [4]
 

 Phillips also obtained a warrant for larceny of Sellars' cellphone.
 

 [5]
 

 Crisp did not recall the exact date of this incident but estimated it happened before her son's birth around 1993.
 

 [6]
 

 Though Defendant's original objection was to admission of the various remains on the whole in
 
 voir dire
 
 , Defendant renewed his objection when the trial court admitted each piece into evidence in front of the jury. Defendant also received a ruling from the trial court for each item.
 

 [7]
 

 In a case where defendant was tried for being an accessory to crimes of disturbing graves, this Court found no error where the trial judge allowed skulls to be admitted, over defense counsel's objection, to show the object offered was the same as the object involved in the incident giving rise to the trial.
 
 State v. Lewis
 
 ,
 
 58 N.C. App. 348
 
 , 351-52,
 
 293 S.E.2d 638
 
 , 641 (1982). A review of caselaw in other jurisdictions reveals skulls have been deemed properly admitted to show identity and injuries,
 
 see e.g.
 
 ,
 
 State v. Cazes
 
 ,
 
 875 S.W.2d 253
 
 , 263 (Tenn. 1994) (
 
 reh'g denied
 
 April 4, 1994); type and location of injury and to corroborate expert testimony,
 
 see e.g.
 
 ,
 
 Larmon v. State
 
 ,
 
 81 Fla. 553
 
 , 555,
 
 88 So. 471
 
 , 471 (1921) ; and condition of the skull,
 
 see e.g.
 
 ,
 
 Texas & P. Ry. Co. v. Williams
 
 ,
 
 200 S.W. 1149
 
 , 1151 (1918).